789 A.2d 162 (2002)
347 N.J. Super. 202
Louis PACE and Diane Pace, his wife, Plaintiffs-Appellants,
v.
Paul S. KUCHINSKY, John Kuchinsky, Defendants-Respondents, and
State Farm Insurance Companies, John Does 1 through 5 (gender neutral fictitious names) and ABC Corporation 1 through 5 (fictitious names), Defendants.
Superior Court of New Jersey, Appellate Division.
Argued November 27, 2001.
Decided February 4, 2002.
*163 Michael Ventura, Summit, argued the cause for appellants (Ventura, Miesowitz, Albano & Keough, attorneys; Mr. Ventura, of counsel and on the brief).
Robert F. Cox, Cranford, argued the cause for respondents (McCreedy and Cox, attorneys; Mr. Cox, on the brief).
*164 Before Judges STERN, EICHEN and LINTNER.
The opinion of the court was delivered by LINTNER, J.A.D.
On March 26, 1998 plaintiff, Louis Pace, and his wife Diane[1] filed a complaint for injuries he allegedly sustained on March 29, 1996, when the vehicle he was operating was struck in the rear by a vehicle operated by defendant Paul Kuchinsky and owned by defendant John Kuchinsky. He appeals from an order of the Law Division determining that the injuries to his lumbar spine were temporary in nature, and barring damages for lumbar injuries that accrued after April 16, 1999, as not being causally related to the March 29 accident. We conclude that the Law Division judge erred in applying the holding in Habick v. Liberty Mutual Fire Ins. Co., 320 N.J.Super. 244, 727 A.2d 51, certif. denied, 161 N.J. 149, 735 A.2d 574 (1999), to the circumstances of this case, and reverse.
We combine the relevant facts and procedural history. Plaintiff alleges that he sustained both cervical and lumbar injuries as a result of the accident. Plaintiffs also named his insurer, State Farm Insurance Companies (State Farm), as a defendant alleging that it failed to provide Personal Injury Protection (PIP) benefits afforded by the policy of insurance issued to plaintiff. State Farm filed its answer in October 1999. Sometime in January 1999, counsel for State Farm contacted plaintiff's counsel and advised that State Farm had paid all plaintiff's medical bills to date and that there was no reason to continue maintenance of the PIP action. Accordingly, on May 5, 1999, after confirming that there were no medical bills outstanding, plaintiff's attorney dismissed the claims against State Farm without prejudice.
After the accident, plaintiff was treated extensively by several doctors. He received emergency treatment at Overlook Hospital on the day of the accident and thereafter was treated by Dr. Julie Kawut, a chiropractor, who saw him for his head, neck and back complaints approximately ninety-eight times between April 1, 1996 and January 28, 1998. An MRI, performed on January 20, 1997, revealed cervical disc herniations at the C5-C6 and C6-C7 levels. On January 31, 1997, he consulted with Dr. Michael Sanaman, a neurologist, concerning his neck, head and shoulder complaints. Sanaman reported that the cervical herniations were a result of the automobile accident. A year later, on January 23, 1998, he was examined by another neurologist, Dr. Nazar Haidri, who found that plaintiff suffered from:
(1) post-concussion syndrome
(2) post-traumatic headaches, dizziness and blurring of vision
(3) chronic cervical dorsal and lumbar sprain
(4) symptoms consistent with bilateral cervical and left lumbar radiculopathy
(5) findings consistent with bilateral carpal tunnel syndrome and neuropathy at both elbows
(6) meralgia paresthetica left side
Haidri ordered various diagnostic tests, including an MRI of the lumbar spine and a consult with a neurosurgeon.
On February 4, 1998, Dr. Daniel Schlusselberg reported to Haidri that the MRI of plaintiff's lumbosacral spine revealed, among other things, multi-level degenerative *165 disc disease. On April 13, 1998, Dr. Arthur Gilman, a neurosurgeon, reported to Haidri that plaintiff's previous MRI studies "demonstrated a small central disc herniation at C5-C6 without significant impingement upon the thecal sac or nerve root exit," as well as "congenital and acquired lumbar stenosis" at L3-L4 and L4-L5 levels with "broad based disc bulge[s]" at L3-L4 and L4-L5. In view of plaintiff's active lifestyle, Dr. Gilman advised that surgery for plaintiff's lumbar discomfort, while possibly relieving the symptoms, might worsen his back discomfort. He further indicated that, if plaintiff's symptoms continued or worsened, surgery might be reconsidered.
On May 11, 1998, following an examination, neurosurgeon Dr. John Knightly confirmed the existence of the cervical herniations and lumbar disc bulges found on the MRI studies and advised that the chronic pain suffered by plaintiff was of "questionable etiology." He recommended against surgical intervention and suggested a physiatrist be consulted. Plaintiff was then seen by Dr. Peter Won, a physiatrist, who found disc protrusions at C5-C6 and C6-C7, as well as disc protrusions and herniations at multiple levels of the lumbar spine. He concluded that "the mechanism of the injury appears to be due to whiplash injury related to [the] motor vehicle accident," and recommended stretching and aerobic exercises.
In August 1998, plaintiff came under the care of physiatrist Dr. Douglas Ashendorf. According to Dr. Ashendorf, at the time plaintiff came under his care, his office practice required that plaintiff execute an assignment of benefits as a condition of treatment. On August 7, 1998, plaintiff executed the assignment of benefits form, authorizing direct payment of health insurance benefits to Dr. Ashendorf. Plaintiff commenced a regime of physical therapy treatments with Dr. Ashendorf. On April 9, 1999, State Farm's claim representative wrote a letter to plaintiff, copied to plaintiff's counsel, stating the following:
Dear Louis Re: Physiatry
You recently attended an Independent Medical Examination (IME). Attached is a copy of the report.
In the doctor's opinion, no further treatment is necessary as a result of your March 29, 1996 accident. We will be unable to consider any further expenses after 4/16/99.
This decision has been based upon the information we have received to date. If you have any additional information or if your medical condition should change, please notify us immediately.
(Emphasis added)
Pursuant to the assignment of benefits, Dr. Ashendorf filed a PIP arbitration claim seeking payment of his outstanding bill in the amount of $9651.24 from State Farm. On October 1, 1999, in support of his claim, Ashendorf's counsel submitted several of the doctor's progress notes and a January 7, 1999 report from Dr. Steven G. Dorsky, who examined plaintiff at Ashendorf's request three days earlier and found essentially that plaintiff's primary complaints of low back pain were secondary to the accident, as was his additional neck pain. Dorsky concluded that plaintiff had "obvious spondylolisthesis and should continue with rehabilitation as well as under your care." Ashendorf also submitted a report of a CT scan performed on February 2, 1999, pursuant to a referral by Dr. Dorsky, which showed essentially L3-L4 bulging of the disc annulus with focal disc protrusion and degenerative facet joint changes, L4-L5 central protrusion of disc material with mild degenerative facet joint changes and ligamentous thickening, and L5-S1 bilateral spondylolysis with degenerative facet *166 joint changes resulting in bilateral foramina stenosis.
On October 11, 1999, State Farm's counsel filed its arbitration submission, which included medical reports from a neurologist, Dr. Lynne Carmickle, and Dr. Horia Schwartz, a physiatrist. Framing the issue to be decided, State Farm stated "at issue is the treatment that State Farm's insured, Louis Pace received from Dr. Ashendorf on August 7, 1998 thru April 23, 1999." Dr. Carmickle's report dated May 19, 1999 covered present complaints, past medical history, physical examination, neurological examination, medical review and radiographs, impressions and a summary. The summary provided a diagnosis, a prognosis and, finally, a treatment recommendation. The treatment recommendation concluded:
No further neurological evaluation or treatment is needed. The patient has received maximal benefit from therapy.
As a caveat to her treatment recommendation, Dr. Carmickle stated the following:
The report submitted here is based on information supplied to me by the claimant, the findings of my examination as reported above and all medical reports sent to my office. If any additional information is provided, an addendum may be required.
On the way to reaching her conclusion regarding the necessity of treatment, Dr. Carmickle also stated the following:
The issue is raised at this time of the medical necessity for surgery. Neuroimaging studies of the lumbar spine reveal multi-level degenerative changes with bilateral spondylolysis ...
An issue raised at this time is the question of whether there is a causal relationship of the patient's complaints to the motor vehicle accident.
She then made the following diagnosis and prognosis of plaintiff's condition based upon her examination and review of the records and reports:
DIAGNOSIS:
1. CERVICAL MUSCLE SPRAIN RESULTING DIRECTLY FROM THE MOTOR VEHICLE ACCIDENT, IF THE PATIENT'S HISTORY IS CORRECT. THERE ARE NO OBJECTIVE SIGNS OR SYMPTOMS TO SUGGEST CERVICAL RADICULOPATHY
2. LUMBAR MUSCLE SPRAIN RESULTING DIRECTLY FROM THE MOTOR VEHICLE ACCIDENT, IF THE PATIENT'S HISTORY IS CORRECT. THERE ARE NO OBJECTIVE SIGNS OR SYMPTOMS TO SUGGEST CLINICAL LUMBAR RADICULOPATHY AT PRESENT.
3. MULTI LEVEL DEGENERATIVE CHANGES WITH DISK BULGE/OSTEOPHYTE RIDGE COMPLEXES, AS WELL AS MINIMAL SPONDYLOLISTHESIS AT L5-S1 DEGENERATIVE IN NATURE AND THEREFORE NOT ESTABLISHED AS BEING CAUSALLY OR TEMPORALLY RELATED TO THE MOTOR VEHICLE ACCIDENT.
PROGNOSIS:
Guarded. Given that the patient's subjective complaints do not match the objective findings on imaging studies, I would not consider that there is a role for surgical intervention in this patient's care. As indicated, the findings noted in the lumbar spine are degenerative in nature, and therefore not established as being causally related to the MVA.
Dr. Schwartz's report, dated May 27, 1999, likewise mentioned whether future surgery was required and causally related. *167 She reported that Dr. Ashendorf's progress reports indicated that he had discussed alternatives to surgery and mentioned that Dr. Dorsky was either contemplating or discussing possible surgery sometime in April 1999. Identifying the question, Schwartz observed:
I have no indication that [plaintiff] stopped working after the accident. There is an implication that he is in construction. How much degenerative arthritic conditions and discomfort he had prior to this accident and what kind of past history he had, I have no information whatsoever. The fact that he started to have increasing discomfort by 1998 and he was seen by other physicians, was tested extensively, was found to have spondylolisthesis as well as radiculopathy does not surprise me. The question is whether or not that condition was causally related to his accident and relative to that I do not have enough information.
I believe that Dr. Dorsky is a little bit too fast in performing surgery.... Surgery without fusion is totally not recommended. Given the fact that this is a chronic discomfort for approximately three years, it is almost a foregone conclusion that it will fail.
She concluded, after pointing out that most of Dr. Ashendorf's treatment was afforded in 1998 and early 1999, that a further period of time should be allowed for conservative treatment "before anyone jumps to the conclusion" that plaintiff needs surgery and recommended that plaintiff be given approximately six months to determine how much benefit is received from the treatment.
Responding to State Farm's submission, Dr. Ashendorf submitted a copy of an August 3, 1998 report prepared for State Farm by Dr. Nathan Zemel of Newark Orthopedic and Neurological Rehabilitation.[2] Dr. Zemel diagnosed the following:
1. LUMBOSACRAL SPRAIN/STRAIN.
2. HNP CERVICAL SPINE, PPH.
3. CERVICAL SPRAIN/STRAIN.
If the patient's history is correct then, there is a causal relationship between the motor vehicle accident of 3/29/96 and the patient's injuries. The patient has achieved maximal medical benefit from the conservative therapeutic regimen rendered to him. No further treatment recommendations are specified at this time. Recovery appears to be complete but permanency is anticipated ... There are no pre-existing conditions affecting this claimant. Claimant is not disabled. Physical therapy started will be palliative for the patient's subjective complaints, but are not felt to be curative in nature as his injury is permanent.
In reply, State Farm submitted yet another report from Dr. Douglas D. Bradley dated September 22, 1999. Dr. Bradley noted the MRI findings of disc herniations at two cervical levels and degenerative disc disease at multiple lumbar levels. He opined that plaintiff sustained cervical and lumbar sprains as a result of the accident and that the findings of degenerative changes were not causally related to the accident. He concluded that there was no need for further therapy or chiropractic treatment and, because no single pain generator had been identified, surgery was not indicated.
The PIP arbitration was held on October 12, 1999 and the arbitrator rendered *168 his award on November 18, 1999, concluding in part:
Claimant must establish causation by a preponderance of the credible evidence. Considering the variations in the examinations of the physicians who were consulted by, or who treated [plaintiff], it is as reasonable to conclude that assignor's back problem is the result of degenerative changes as it is to conclude that it was caused by the accident. Claimant has not carried the burden of proof. Any medical expenses incurred by assignor after April 16, 1999, the effective date of [State Farm's] "cut-off" letter are not [State Farm's] responsibility.
On January 26, 1999, pursuant to plaintiff's request for modification and clarification of the award, the Arbitrator issued a Modified Award providing:
A. Review of the testimony and evidence produced at the arbitration hearing reveals that services rendered by claimant to assignor [on six dates prior to the cutoff date] were not paid by respondent. I find that these services were causally related to the accident, and were reasonable and necessary. See, Thermographic Diagnostic[s] v. Allstate, 125 N.J. 491, 593 A.2d 768 (1991). The arbitrator previously concluded, in error, that all services to April 16, 1998[sic] had been paid. The arbitrator found that services rendered subsequent to April 16, 1999, the date included in respondent's "cut-off" letter were not respondent's obligation. It is implicit that the services rendered by claimant to assignor prior to that date are payable....
B. In all other respects the Award is affirmed.
Ultimately, plaintiff was hospitalized and Dr. Knightly performed lumbar surgery on November 24, 1999, which involved laminectomies at levels L3-L5 and posterolateral fusion at L3-S1, which were stabilized with screw fixation. Cervical discectomy and fusions at C5-C6 and C6-C7 were performed by Dr. Knightly in March 2000. On March 22, 2000, Dr. Knightly reported that, in his opinion, although the "degenerative changes present in both the cervical and lumbar spine ... predate the patient's accident, his pain syndrome was certainly after the motor vehicle accident." Dr. Knightly further opined that the chronic pain syndrome which developed in both plaintiff's neck and back were "to a reasonable degree of medical certainty a direct result of the automobile accident." In a subsequent report, Knightly concluded that plaintiff would have permanent difficulties with both his lumbar and cervical spine as a result of the accident.
In a report supplied by plaintiff, dated April 24, 2000, Dr. Allan Tiedrich, an orthopedist, concurred with Dr. Knightly's opinion and added that although the degenerative changes to plaintiff's spine may have been present before the accident, the accident "clearly aggravated the degenerative changes and caused the chronic pain syndrome." He reached his conclusion based on the fact that plaintiff was completely pain free prior to the accident, without any limitation in activities.
Defendant had plaintiff examined and obtained two medical reports: one from an orthopedic surgeon, Dr. Michael Bercik, and the other from neurologist, Dr. Allen Josephs. Dr. Bercik concluded in his report of February 23, 1999, that plaintiff sustained a post-cervical sprain and postlumbosacral sprain as a result of the accident, had reached the maximal benefit of treatment and sustained no permanent physical impairment to either his neck or back. In his report of April 6, 1999, Dr. Josephs found that plaintiff, "despite multiple abnormalities seen on his scanning, [had] ... minimal objective findings on *169 examination." He reported that, although plaintiff had "multiple disc bulging and/or herniations," which may contribute to his present symptomatology, some are clearly pre-existing in nature. He also found a mild degree of objective neurologic permanence related to the accident.
In November 1999, defendant moved to dismiss plaintiff's claim for lumbar injury. The motion sought to preclude plaintiff from proving that his low back condition and subsequent surgery were related to the March 29, 1996 accident. After hearing argument on the motion, the judge scheduled a plenary hearing to determine the scope of the previous arbitration hearing, stating to counsel:
I want to know what happened at that [arbitration] hearing. I want to know why [plaintiff] went to that hearing, who notified him of the hearing, when he was notified of the hearing, was it an attorney that notified him, was it someone else, who was the attorney that notified him. After you find out from the attorney who notified him, was that attorney present at the hearing. What was done at the hearing?
On January 5, 2001, a plenary hearing was held to determine whether plaintiff had received a full and fair hearing before the arbitrator, as well as the scope of the arbitration. The testimony revealed that Dr. Ashendorf advised plaintiff that Ashendorf's attorney had filed the PIP arbitration on Dr. Ashendorf's behalf to collect the unpaid portion of his bill. On October 12, 1999, a secretary from Dr. Ashendorf's office telephoned plaintiff and told plaintiff that twenty-five percent of the doctor's bill was not paid and the doctor wanted plaintiff to testify as a witness. Following that phone call, plaintiff called his attorney and asked if it was all right for him to attend the arbitration. Counsel responded that "it would be okay to go." Plaintiff's attorney did not attend the arbitration hearing.
According to plaintiff, he was never advised "that the outcome of the arbitration hearing could have had a potential effect on [his] right to have a trial by jury." Plaintiff met with Dr. Ashendorf's attorney for the first time on the day of the arbitration. It was plaintiff's understanding that he was "appearing at the arbitration as a witness, and not as a party." Plaintiff testified about the lumbar injury that he contended was caused by the accident and that he had no prior low back problems. He also acknowledged that he was not precluded from introducing evidence regarding his lumbar injury.
Copies of both State Farm's and Ashendorf's arbitration submissions were presented, as was an affidavit from the attorney who appeared for State Farm at the arbitration. State Farm's attorney indicated in his certification that it struck him as "unusual" that Ashendorf's counsel had actually called plaintiff and Dr. Ashendorf as witnesses. He also stated the following:
8. After this, the [arbitrator] heard live testimony from [plaintiff] as well as Dr. Ashendorf. After counsel for plaintiff conducted his direct examination, my cross-examination focused on the two year gap in treatment as well as plaintiff's MRI films which revealed degenerative changes in his low back unrelated to trauma. I questioned both plaintiff and the doctor with respect to this issue.
9. After I had completed my crossexamination, I recall that the [arbitrator] conducted somewhat lengthy examinations of both the doctor and plaintiff as well.
At the plenary hearing, Ashendorf's arbitration counsel testified that the issue of causation was not fully litigated and was beyond the scope of the PIP arbitration. He indicated that he had considerable experience *170 and expertise in handling over 250 PIP arbitrations. He responded, "I would say no," when asked:
Based on your experience and involvement in this matter, in your experience as an attorney who handles other personal injury matters, do you believe that the issue of ... the causal relationship of [plaintiff's] lower back injury was fully litigated at that arbitration hearing, as if it was being submitted to a trial by jury in a personal injury trial?
Ashendorf's counsel stated that "[o]ne would conclude ... that not only myself but State Farm was raising an issue of... maximum medical benefit from treatment rendered by Dr. Ashendorf, not whether or not Plaintiff's back injury was related to the accident." He acknowledged that although he was representing Dr. Ashendorf, Dr. Ashendorf's rights "were derivative of the assignment." He further acknowledged that it was not his usual practice to have the medical provider present at an arbitration hearing, conceding that it was a "rare" occurrence, and that "[g]enerally on the assignment arbitrations the patients are not testifying."
Against this backdrop, the motion judge found the following.
The court finds that the facts of this case are similar to the facts in Habick, and accordingly, the issues decided by the arbitrator are binding on the plaintiff in any subsequent trial.
...
Plaintiff argues that he should not be bound by the decision of the arbitrator because the PIP arbitration was far more limited in scope than the issues to be presented at trial regarding plaintiff's lumbar injury. The court does not find this argument persuasive. If the plaintiff makes this argument because [he] received more treatment to his lumbar injury subsequent to the arbitrator's decision, then that argument fails. Regardless of such treatment, that information is not relevant to the issues to be decided at trial as the arbitrator specifically found that any lumbar injury treatments rendered after the April 16, 1999 cut-off date were degenerative in nature rather than causally related to the accident. If the plaintiff makes that argument because the lumbar injury is only one portion of the case ... that argument similarly fails. Where part of an entire controversy has been decided in arbitration and part remains for trial, the collateral estoppel doctrine is applicable to eliminate wasteful litigation of issues in court that have already been decided in arbitration. See Martin Rush, Urology Associates, P.A. v. Kuhn, Smith, and Harris, Inc., 193 N.J.Super. 389, 474 A.2d 1072 (App.Div.1984).
...
[The arbitrator] specifically found that any treatments rendered to the plaintiff subsequent to the April 16, 1999 cut-off date were not the responsibility of the defendant as the need for treatment after that date was not causally related to the accident.... In our case [as in Habick] the only issue properly before the arbitrator was whether the defendant was responsible for treatment rendered to the plaintiff's lumbar region subsequent to the cut-off date. As bills prior to that date were not in issue, neither party had the opportunity nor the incentive to argue whether plaintiff's lumbar injuries which were treated without objection up until that date were causally related to the accident. Therefore, neither party is bound by the arbitrator's finding that treatments rendered to plaintiff's lumbar region prior to the April 16, 1999 cut-off date were causally related to the accident and neither *171 is collaterally estopped from litigating medical causation for plaintiff's lumbar injuries up to that date. Plaintiff is, however, barred from alleging future pain and suffering or loss of enjoyment or earning due to the surgery to the lumbar spine which occurred after the April 16, 1999 cut-off date, as that issue was decided in the PIP arbitration.
We first review the general principles governing the application of the doctrine of collateral estoppel. Collateral estoppel may apply if the party asserting the bar demonstrates that: (1) the issue to be precluded is identical to the issue decided in the first proceeding; (2) the issue was actually litigated in the prior action, that is, there was a full and fair opportunity to litigate the issue in the prior proceeding; (3) a final judgment on the merits was issued in the prior proceeding; (4) determination of the issue was essential to the prior judgment; and (5) the party against whom issue preclusion is asserted was a party to or in privity with a party to the prior proceeding. In re Estate of Dawson, 136 N.J. 1, 20-21, 641 A.2d 1026 (1994); Selective Ins. Co. v. McAllister, 327 N.J.Super. 168, 173-74, 742 A.2d 1007 (App.Div.2000); Pivnick v. Beck, 326 N.J.Super. 474, 485, 741 A.2d 655 (App. Div.1999), aff'd, 165 N.J. 670, 762 A.2d 653 (2000). Even where these requirements are met, the doctrine, which has its roots in equity, will not be applied when it is unfair to do so. Barker v. Brinegar, 346 N.J.Super. 558, 788 A.2d 834 (App.Div. 2002); Kozlowski v. Smith, 193 N.J.Super. 672, 675, 475 A.2d 663 (App.Div.1984); McAllister, supra, 327 N.J.Super. at 174, 742 A.2d 1007; Pivnick, supra, 326 N.J.Super. at 485-86, 741 A.2d 655; In re Tenure Hearing of Tanelli, 194 N.J.Super. 492, 497, 477 A.2d 394 (App.Div.), certif. denied, 99 N.J. 181, 491 A.2d 686 (1984).
The factors favoring issue preclusion include: "conservation of judicial resources; avoidance of repetitious litigation; and prevention of waste, harassment, uncertainty and inconsistency." McAllister, supra, 327 N.J.Super. at 174, 742 A.2d 1007 (quoting Pivnick, supra, 326 N.J.Super. at 486, 741 A.2d 655). Those disfavoring preclusion include: the party against whom preclusion is sought could not have obtained review of the prior judgment; the quality or extent of the procedures in the two actions is different; it was not foreseeable at the time of the prior action that the issue would arise in subsequent litigation; and the precluded party did not have an adequate opportunity to obtain a full and fair adjudication in the prior action. Id. (citing Restatement (Second) of Judgments § 28 (1982)).
Applying these general principles, we are constrained to disagree with the motion judge's reliance on Habick, supra, 320 N.J.Super. 244, 727 A.2d 51, because the factual circumstances here are different than those faced in Habick and militate against issue preclusion. In Habick the plaintiff, Rosemarie Habick, allegedly suffered from TMJ and a right knee injury as a result of an automobile accident with an uninsured driver. Id. at 246, 727 A.2d 51. Her PIP carrier paid for treatment of her TMJ condition and approved arthroscopic surgery for her knee. Ibid. When her treating physician later recommended knee replacement surgery in lieu of the arthroscopic procedure, the carrier refused based upon its own medical examiner's report. Habick filed for PIP arbitration seeking coverage for the right knee replacement surgery. She also sought UM arbitration, which the UM arbitrators adjourned pending the final outcome of the PIP arbitration. The PIP arbitrator denied Habick's claim, finding that she had received minor soft tissue injuries, which *172 did not aggravate either her pre-existing osteoarthritic knee or her continuing TMJ condition. Id. at 246-47, 727 A.2d 51. Habick then filed a verified complaint in the Law Division seeking in part to limit the scope of the arbitrator's decision to reflect that it was without prejudice to her pending UM claim. Id. at 247, 727 A.2d 51.
Applying collateral estoppel to bar relitigation of the issue of causal relationship respecting the right knee injury in the UM proceedings, Habick observed that the "key factor is the opportunity to be heard fully." Id. at 255, 727 A.2d 51. Equitable application of the doctrine of collateral estoppel requires not only that the party sought to be precluded had a full opportunity to be heard, but also had an "incentive to make a case." Id. at 255, 727 A.2d 51. A party sought to be precluded under the doctrine of collateral estoppel must have his or her "day in court" on the specific issue in question. Unless expressly waived, a full and fair hearing requires representation by the party's own counsel, thereby insuring presentation of the specific issue to be decided in the very manner that the party chooses. Kozlowski, supra, 193 N.J.Super. at 675, 475 A.2d 663. This is especially so where the party sought to be precluded was not the identical party in the prior proceeding. McAndrew v. Mularchuk, 38 N.J. 156, 161, 183 A.2d 74 (1962).
Unlike Habick, here the real party in interest in the preceding arbitration was Dr. Ashendorf, not plaintiff. While Dr. Ashendorf was the assignee of plaintiff's PIP claim, his overriding interest was the payment of his outstanding bills for the specific treatment he rendered, not plaintiff's overall damage claim or future need for surgery. While Rosemarie Habick was represented by her own counsel, here plaintiff's counsel was not present and plaintiff did not have the opportunity to present the issues in the same way as he might have, had his interest been fully represented by counsel. In Habick, the issues were well defined between the parties, both of whom were the same in each proceeding. Here, by contrast, they were not. Defendant, who now seeks to take advantage of the determination of the PIP arbitrator, is confronted with different issues and claims than those asserted against State Farm, in whose favor the arbitration decision was rendered. The parties in interest at the PIP arbitration are not the same parties involved here. It is these very differences that give rise to the equitable considerations enumerated in subsection five of § 28 of the Restatement, disfavoring preclusion.
Initially, when State Farm notified both Dr. Ashendorf and plaintiff's attorney that it was cutting off treatment, the letter specifically identified "Physiatry"[Phychiatry] as the subject matter under consideration. On October 11, 1999, State Farm's submission in response to Dr. Ashendorf's PIP claim framed the issue as "the treatment that State Farm's insured ... received from Dr. Ashendorf." Although to a limited extent the medical reports submitted by State Farm embrace the reporting doctors' opinions concerning the need for surgery intervention and causation, the conclusions insofar as they related to the specific PIP claim made by Dr. Ashendorf dealt expressly with the lack of need for further treatment and whether plaintiff received maximal benefit from the therapy he received. When read together with State Farm's own statement of position, one is led to the inevitable conclusion that the scope of the arbitration was limited to whether plaintiff received maximal benefit from the physical therapy treatment rendered by Dr. Ashendorf for those injuries causally related to the accident. Simply put, it was not foreseeable that a decision *173 on Dr. Ashendorf's limited claim would forever preclude plaintiff from relating surgery, not yet performed, to his pending third-party claim for pain, suffering and permanency.
We conclude that the scope of the PIP arbitration between Dr. Ashendorf and State Farm was limited to the doctor's claims for payment for treatment provided. It embraced a specific controversy between Dr. Ashendorf and State Farm, not plaintiff and defendant. Notwithstanding the opinions reflected in the various medical reports secured by State Farm concerning the lack of causal relationship and non-necessity for future surgery, the scope of the issue as presented, in light of Dr. Ashendorf's specific claim, neither afforded plaintiff an adequate opportunity to be heard nor an incentive to demand a full and fair adjudication concerning his lumbar injuries and whether his resulting surgery and disability, if any, were casually related to the accident. We therefore reverse and remand for further proceedings to permit plaintiff the opportunity to pursue claims for lumbar injuries and resulting surgery.
Reversed and remanded.
NOTES
[1] As Louis Pace suffered the injuries for which he seeks damages, we refer to him as "plaintiff."
[2] State Farm had not submitted Dr. Zemel's report. It is unknown whether Dr. Zemel's report is the one referred to in State Farm's notice of April 16, 1999, cutting off Dr. Ashendorf's treatment.