866 A.2d 1000 (2004)
375 N.J. Super. 63
Hilda PEREZ, on Behalf of Herself and All Others Similarly Situated, Plaintiff-Appellant,
v.
RENT-A-CENTER, INC., Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued December 13, 2004.
Decided February 4, 2005.
*1002 Seth R. Lesser, New York, NY, argued the cause for appellant (Locks Law Firm; Williams Cuker & Berezofsky; and William Riback, attorneys; Mr. Lesser, Mark Cuker, Philadelphia, PA, and Mr. Riback, on the brief).
Ezra D. Rosenberg, Princeton, argued the cause for respondent (Dechert, attorneys; Mr. Rosenberg, David A. Kotler, and Thomas Kane, on the brief).
National Consumer Law Center, attorneys for amicus curiae Consumer Law Center, Consumer Federation of America, New Jersey Public Interest Research Group Citizen Lobby and U.S. Public Interest Research Group (Sanford Wittels & Heisler and National Consumer Law Center, attorneys; Steven L. Wittels, Armonk, NY, Dale Graddon, Washington, DC, and Stuart T. Rossman, Boston, MA, of counsel and on the brief).
Loughlin & Latimer, attorneys for amicus curiae Consumers League of New Jersey (Michaelene Loughlin, Hackensack, on the brief).
Before Judges PETRELLA, LINTNER and PARKER.
The opinion of the court was delivered by
PETRELLA, P.J.A.D.
Plaintiff Hilda Perez appeals from a summary judgment dismissing her complaint[1] alleging that her "rent-to-own" contracts with defendant Rent-A-Center, Inc. (defendant or Rent-A-Center) violated the Consumer Fraud Act, N.J.S.A. 56:8-1 to -135, and the Retail Installment Sales Act (RISA), N.J.S.A. 17:16C-1 to -61, because the time-price differential exceeded the 30% per annum interest rate permitted under the criminal usury statute, N.J.S.A. 2C:21-19. Defendant counterclaimed for return of the items Perez had rented from it because she had ceased making rental payments. We affirm the grant of summary judgment and conclude that neither the Rental Sales Installment Contract (RISA) nor the criminal usury statute is applicable to the sales transactions at issue.
On appeal, Perez argues that: (1) Rent-A-Center's contracts in New Jersey are governed by RISA, and it is collaterally estopped from arguing to the contrary; (2) the judge erred in holding that RISA did not apply; (3) RISA does not permit the charging of a time price differential/interest greater than 30% per annum; (4) the Saul [[2]] and Steffenauer [[3]] decisions *1003 referred to by the motion judge are not applicable to whether RISA contracts are subject to a 30% interest cap; and (5) Rent-A-Center's reliance on common law doctrines of "Loan or Forbearance" of money or the "Time Price Doctrine" is inconsistent with the legislation.
On November 25, 2002, Rent-A-Center filed a small claims complaint against Perez in Camden County seeking money damages arising from Perez's refusal to pay for or return a big-screen television and computer that she had rented from it. The record does not reflect the resolution of the small claims action. Perez contends she answered the small claims complaint with a "class action counterclaim," and moved to transfer the case to the Law Division, but while her motion to transfer was pending, Rent-A-Center dismissed its complaint.
Conversely, Rent-A-Center contends that the small claims action was transferred to the Law Division and consolidated with remaining similar claims in Utley v. Rent-A-Center, Inc., CAM-L-2432-02, which was ultimately removed to the United States Bankruptcy Court for the District of New Jersey. Perez denies that the case was consolidated with Utley.
Neither party substantiates their version of the procedural history except for providing a copy of the small claims complaint. For purposes of this appeal it appears that: (1) the small claims action is either no longer pending or was consolidated with the Law Division action presently under appeal; and (2) whether a consolidation ever occurred between the case under review and Utley is now immaterial.
On March 21, 2003, Perez filed an "amended"[4] complaint in the Law Division, alleging that her "rent-to-own" contracts with Rent-A-Center violated the Consumer Fraud Act and RISA because they imposed a time-price differential allegedly in excess of the 30% per annum interest rate permitted under the criminal usury statute. Rent-A-Center counterclaimed for breach of contract and conversion. It sought compensation for property Perez allegedly rented, including furniture, a washer and dryer, a computer, a big-screen television and cabinet, and a DVD player, with a retail value aggregating about $9,300, on which she stopped making payments after paying $8,156.72, and which she refused to return. Perez answered the counterclaims, denying liability and claiming entitlement to the rented items on the ground that Rent-A-Center was legally prohibited from enforcing the rent-to-own contracts.
In September 2004, Perez moved for partial summary judgment and Rent-A-Center cross-moved for summary judgment. In a November 21, 2004 oral opinion, the judge held that rent-to-own transactions are not covered by either RISA or the criminal usury statute and granted Rent-A-Center's cross-motion. A January 14, 2004 order dismissed Perez's complaint.
A consent order dated February 12, 2004 was then entered in Rent-A-Center's favor on it's remaining counterclaims against Perez, and she was directed to return all merchandise rented from Rent-A-Center. Enforcement of the order was stayed, however, until thirty days after resolution of this appeal.
Rent-A-Center, a Delaware corporation with corporate offices in Texas, is apparently *1004 the largest company in the rent-to-own industry. As of December 2002, it owned forty Rent-A-Center stores and had eight franchised stores in New Jersey.
The Federal Trade Commission (FTC), in an April 2000 study, described the rent-to-own industry as:
The rent-to-own industry (also known as the rental-purchase industry) consists of dealers that rent furniture, appliances, home electronics, and jewelry to consumers. Consumers enter into a self-renewing weekly or monthly lease for the rented merchandise, and are under no obligation to continue payments beyond the current weekly or monthly period. At the end of each period, the consumer can continue to rent by paying for an additional period, or can return the merchandise. The lease provides the option to purchase the goods, either by continuing to pay rent for a specified period of time, usually 12 to 24 months, or by early payment of some specified proportion, usually 50 to 60 percent, of the remaining lease payments.
Rent-to-own transactions offer immediate access to household goods for a relatively low weekly or monthly payment, typically without any down payment or credit check. These terms are attractive to many customers who cannot afford a cash purchase, may be unable to qualify for credit, and are unwilling or unable to wait until they can save for a purchase. Some consumers also may value the flexibility offered by the transaction, which allows return of the merchandise at any time without obligation for further payments or negative impact on the customer's credit rating. Other consumers may rent merchandise to fill a temporary need or to try a product before buying it. (footnotes omitted).
The FTC found that rent-to-own customers were distinct in many ways from non-rent-to-own customers. Rent-to-own customers were more likely to be poorer and less educated. FTC statistics were that 67% of rent-to-own customers intended to purchase the merchandise when they began the rent-to-own transaction, and 70% of rent-to-own merchandise was ultimately purchased by the customer.
A 1996 Price Waterhouse, LLC survey for Rent-A-Center of its customers in New Jersey confirmed that Rent-A-Center's customers used its services because they could not afford to purchase the items at a traditional retail store. Most customers understood, however, that ultimately the total payments to purchase an item would be more than they would pay at a traditional retail store.
Two of Rent-A-Center's economic experts in the present litigation, Patrick Gaughan, Ph.D., and Henry L. Fuentes, C.P.A., conducted an analysis of Rent-A-Center's product offerings. They found that 64% of rental units were ultimately acquired by defendant's customers. An average of eighteen months was generally required to obtain ownership of new merchandise.
Perez entered into five rent-to-own contracts with Rent-A-Center through its store in Pennsauken. She indicated that she intended to purchase the items she rented. She testified at depositions that she might not have fully understood all of the contract terms. In a March 3, 2001 contract Perez rented several pieces of furniture. In an April 23, 2001 contract she rented a washer and dryer. In an August 3, 2001 contract Perez rented a DVD player and television. In a November 17, 2001 contract she rented a computer. In the fifth contract, dated May 6, 2002, she rented a big-screen television *1005 and cabinet.[5]
The following table summarizes Perez's rent-to-own contracts with defendant:

Agreement Cash Weekly Weeks to Total Rent-To-Own Amount Perez
Number Date Product Price Rate* Ownership Cost** Paid***
34413833 03/03/01 furniture $1,951.43 $ 38.99 91.4 $ 3,902.76 $2,573.34
34414122 04/23/01 washer/dryer 987.47 21.99 95.3 1,984.90 1,418.71
34414671 08/03/01 DVD/TV 1,160.99 22.99 92.0 2,321.99 1,264.39
34415383 11/17/01 computer 2,235.48 42.99 95.0 4,470.96 1,934.69
34416433 05/06/02 big-screen 2,966.35 45.99 120.0 5,932.71 965.79
 TV & Cabinet
 _________ _______ __________ _________
 $9,301.72 $172.95 $28,613.32 $8,156.72
* Weekly Rate[6]
** Total Rent-To-Own Cost[7]
*** Amount Perez Paid.[8]
Under the contracts, Perez promised to maintain the items in good working order during the rental terms, normal wear and tear excepted. She was liable for excess damages and loss or destruction of the property from any cause, including, but not limited to, theft or vandalism. Perez could terminate each one of her rent-to-own contracts at her option at the end of any rental term, without penalty. To terminate the contract, the renter had to arrange for the return of the property and make all rental payments due through the date of return. Alternatively, the renter could continue the rent-to-own contract by paying, in advance, a rental installment for another weekly, semi-monthly, or monthly rental term.
The contracts explicitly stated that they were "rental agreements only" and defined the means by which a renter could purchase the rented product. The agreements stated:
THIS IS A RENTAL AGREEMENT ONLY
This is a rental agreement only. You will not acquire any equity in the property by making rental payments. You have not agreed to purchase this property, and will not acquire any ownership rights in it unless you have, at your option, paid the total of rental payments *1006 plus the option payment necessary to acquire ownership.
The rental agreements further stated (using the example of the big-screen television rental agreement):
4. OWNERSHIP: We own the property you are renting. You will not acquire any ownership rights in the property unless you have, at your option, paid the total of payments plus the purchase option price necessary to acquire ownership as set forth below, or exercise the early purchase option described below. If you want to purchase this or similar property now, you may be able to get cash or credit terms from other sources which will result in a lower total cost than the rental payments, plus the purchase option price provided for below. OPTION TO PURCHASE: If you renew this Agreement for 120.0 successive weeks, you will pay a total of $5,518.80 or if you renew this Agreement for 55.6 successive semi-months, you will pay a total of $5,479.38 or if you renew this Agreement for 27.8 successive months, you will pay a total of $5,114.08 and will have the option to purchase the property for its then fair market value. For purpose of this option, this price will not exceed $413.91. Thus, in order to acquire ownership of this item, you must pay the total amount of $5,932.71 if you pay weekly rental payments, or $5,893.29 if you pay semi-monthly rental payments, or $5,527.99 if you pay monthly rental payments. Figures do not include tax.
5. OUR CASH PRICE FOR THIS PROPERTY is $2,966.35. This price may be different from the MSRP or other available retail prices.
6. EARLY PURCHASE OPTION: If you wish to purchase the rental property, you may do so at any time by the payment of 50% of the remaining rental payments calculated at that time, plus 50% of the option to purchase amount described above.
Rent-A-Center employed various experts. Gaughan, an economist, and Fuentes, a CPA, conducted an economic analysis of Rent-A-Center's product offerings and were of the opinion that Rent-A-Center was not engaged in the outright sale of products. They concluded that the "product" offered by Rent-A-Center was actually a package of products and services that included product delivery, pick-up, and maintenance.
Gaughan and Fuentes were also of the view that the costs Rent-A-Center incurred in providing its package of products and services were substantial, including, but not limited to, delivery and pick-up costs, maintenance and refurbishment costs, and costs for write-offs of uncollectable or "returned-unrentable" merchandise. They stated that these costs differed from those incurred by sellers of comparable products.
Finally, Gaughan and Fuentes concluded that "time-price differentials" or "implied interest rates" could not be calculated for Rent-A-Center's rent-to-own transactions. Any such calculations would fail to consider the unique nature of the rent-to-own transactions, the package of products and services being marketed, and the cost of providing that package.
A. Charlene Sullivan, an Associate Professor of Management at Purdue University's Graduate School of Management, essentially agreed with Gaughan and Fuentes. She opined that: Rent-A-Center's transactions are not sales transactions or installment sales transactions; the majority of Rent-A-Center's transactions do not result in ownership; there is no typical outcome in one of Rent-A-Center's transactions; its cost structure is dramatically different from that of a business selling *1007 household goods; and there is no time-price differential in its transactions.
James J. White, a professor of law at the University of Michigan Law School, and Charles W. Mooney, Jr., a professor of law at the University of Pennsylvania Law School, submitted legal opinions on behalf of Rent-A-Center to the effect that rent-to-own contracts are not retail installment contracts as defined by RISA. These opinions, however, would be inadmissible at a trial based upon the general rule that experts may not render opinions on questions of law. Boddy v. Cigna Prop. & Cas. Cos., 334 N.J.Super. 649, 659, 760 A.2d 823 (App.Div.2000); Healy v. Fairleigh Dickinson Univ., 287 N.J.Super. 407, 413, 671 A.2d 182 (App.Div.), certif. denied, 145 N.J. 372, 678 A.2d 713, cert. denied, 519 U.S. 1007, 117 S.Ct. 510, 136 L.Ed.2d 399 (1996). Thus, we may disregard them. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523, 666 A.2d 146 (1995) (on summary judgment court may only consider "competent" evidential materials presented).
Perez employed two experts. James Hunt, an actuary, calculated interest rates for several of Perez's rental agreements with Rent-A-Center, assuming she made all payments contemplated by the agreements. He opined that: (1) for the washer and dryer, the annual interest rate was 79.9%; and (2) for the furniture, the annual interest rate was 82.7%. The annual interest rate for the DVD player fell somewhere between 79.9% and 82.7%. Hunt was of the opinion that interest rate calculations were valid even if the items were rented for only one week, as long as there remained the option to buy.
Perez's other expert, Dr. Jane Kolodinsky, an economics professor at the University of Vermont, calculated time-price differentials charged with respect to five different product categories sold at Rent-A-Center's stores in New Jersey. She opined:
(1) For DVD players, the average time-price differential for weekly payments was 143.6%; for monthly payments, it was 110.5%.
(2) For televisions, the average time-price differential for weekly payments was 96.5%; for monthly payments, it was 79.4%.
(3) For refrigerators, the average time-price differential for weekly payments was 99.5%; for monthly payments, it was 81%.
(4) For dryers, the average time-price differential for weekly payments was 93.7%; for monthly payments, it was 76.4%.
(5) For washers, the average time-price differential for weekly payments was 100.9%; for monthly payments, it was 81.2%.
Kolodinsky further opined that, across five product categories, sixteen locations, and almost 400 time-price differential calculations (weekly and monthly), the average time-price differential for weekly payments at defendant's New Jersey stores was 106.78%; for monthly payments it was 85.7%. Hunt concurred in Kolodinsky's calculations.
Rent-A-Center's experts, Gaughan and Fuentes, responded that the calculations made by Perez's experts were flawed and invalid because her experts had worked under the mistaken assumption that Rent-A-Center's rental agreements were financed sales and did not take into consideration the unique nature of the rent-to-own business.

I.
The initial question before us is whether the rent-to-own contracts between Perez and Rent-A-Center are "retail installment *1008 contracts" under RISA.[9] The motion judge held that they were not. Our standard of review is de novo. Manalapan Realty, L.P. v. Tp. Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995).

Collateral Estoppel
Before addressing whether the parties' rent-to-own contracts are governed by RISA, we turn to Perez's contention that Rent-A-Center is barred by the doctrine of collateral estoppel from arguing that its contracts are not governed by RISA based on the resolution of an earlier case in which Rent-A-Center was a defendant, Robinson v. Thorn Americans, Inc., CAM-L-3697-94.
Robinson was a class action in which the plaintiffs alleged, among other things, that Rent-A-Center's contracts violated RISA. In April 1996, the Law Division certified a class consisting of "all residents of New Jersey who are or have been parties to contracts to rent-to-own merchandise from Defendant[s] since April 19, 1988."
Rent-A-Center filed two motions for summary judgment, contending that RISA did not apply to its rent-to-own contracts. The Law Division denied the motions, concluding that the contracts were governed by RISA. Plaintiffs moved for partial summary judgment. On January 24, 1997, the Law Division ruled that in several respects Rent-A-Center's contracts and business practices violated RISA and the Consumer Fraud Act and entered partial summary judgment in plaintiffs' favor. The entire case was not resolved because the judge made no findings as to certain alleged violations of RISA, and denied summary judgment on a count in the complaint alleging violation of usury laws. Rent-A-Center's motion for leave to appeal was denied.
The record is unclear as to what happened to plaintiffs' remaining claims in Robinson. However, the record reflects that in September 1997 partial summary judgment was granted in plaintiffs' favor on the issue of damages with respect to the Consumer Fraud Act claim and that in January 1998 the Law Division entered judgment in plaintiffs' favor. Execution of the judgment was stayed pending Rent-A-Center's appeal. The case, however, settled before argument and we dismissed the appeal without prejudice to reinstatement if the settlement was not consummated. The settlement was consummated under an agreement by which Rent-A-Center denied liability and plaintiffs agreed that the settlement could not be construed as an admission of liability. Rent-A-Center agreed to a cash settlement of $48,450,000 and to amend its rental agreements in New Jersey. In exchange for the compromises made by Rent-A-Center, plaintiffs agreed to the dismissal of their claims. On October 13, 1999, after a hearing under R. 4:32-4, judgment was entered in accordance with the settlement and all claims against Rent-A-Center were dismissed with prejudice and without costs.
The facts presented in this case do not warrant application of collateral estoppel. The common issue between Robinson and the present case is a novel issue of law and public importance that has not been addressed by the highest court of this State. Moreover, as a trial court decision Robinson is not binding on other courts. See Restatement (Second) of Judgments, §§ 28 and 29 (1982), and comment I to § 29.
*1009 There are five elements to collateral estoppel: (1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) there was a full and fair opportunity to litigate the issue in the prior proceeding; (3) a final judgment on the merits was issued in the prior proceeding; (4) determination of the issue was essential to the prior judgment; and (5) the party against whom issue preclusion is sought was a party to, or in privity with, a party to the prior proceeding. Fama v. Yi, 359 N.J.Super. 353, 359, 820 A.2d 65 (App.Div.), certif. denied, 178 N.J. 29, 834 A.2d 403 (2003); Pace v. Kuchinsky, 347 N.J.Super. 202, 215, 789 A.2d 162 (App.Div.2002); Barker v. Brinegar, 346 N.J.Super. 558, 565-567, 788 A.2d 834 (App.Div.2002).
Collateral estoppel has its roots in equity. Therefore, even if all five elements are met, collateral estoppel may still be denied if applying the doctrine would be unfair. Fama, supra (359 N.J.Super. at 359, 820 A.2d 65); Pace, supra (347 N.J.Super. at 215-216, 789 A.2d 162); Barker, supra (346 N.J.Super. at 566, 788 A.2d 834).
Here, the third element of the collateral estoppel doctrine has not been met. The final judgment in Robinson was not on the merits, but was entered pursuant to a settlement agreement and resulted in the dismissal of plaintiffs' claims with prejudice, not a judgment in favor of plaintiffs.[10]
The procedural history of Robinson distinguishes it from the cases upon which Perez relies for application of collateral estoppel. In the cases upon which she relies, the parties settled after the appeal was filed and asked the appellate courts to vacate the judgments. The appellate courts demurred. See, e.g., U.S. Bancorp Mortgage Co. v. Bonner Mall P'ship, 513 U.S. 18, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994); In re Mem'l Hosp. of Iowa County, Inc., 862 F.2d 1299 (7th Cir.1988); Ringsby Truck Lines, Inc. v. W. Conference of Teamsters, 686 F.2d 720 (9th Cir.1982). The United States Supreme Court has held that, where cases have been settled while on appeal, it is generally, although not always, inappropriate for federal appellate courts to vacate the lower courts' earlier judgments. U.S. Bancorp, supra (513 U.S. at 29, 115 S.Ct. at 393, 130 L.Ed.2d at 244). The Court noted, however, that an appellate court could choose to remand the case to the trial court for consideration of the vacatur request. Ibid.
This case is more akin to Aetna Cas. & Sur. Co. v. Ply Gem Indus., Inc., 313 N.J.Super. 94, 712 A.2d 717 (Law Div.1997), rev'd on other grounds, 343 N.J.Super. 430, 778 A.2d 1132 (App.Div.), certif. denied, 170 N.J. 390, 788 A.2d 774 (2001). In that case the court ruled that the defendant was not collaterally estopped by a Florida judgment as a result of a jury verdict that had been vacated after a settlement during the appeal. Id. at 105-106, 712 A.2d 717. As here, the case was settled before the appeal was decided, and we remanded to the trial court, which vacated the earlier judgment. Ibid. As a result, we reject Perez's contention that Rent-A-Center is collaterally estopped from arguing that its rent-to-own contracts are not governed by RISA.[11]

*1010 II.
Rent-A-Center contends that rent-to-own contracts should not be considered "retail installment contracts" under RISA because it believes that when RISA is read as a whole it shows the Legislature's intent to apply the Act's restrictions only to situations where the consumer is obligated at the time of the agreement to pay the full purchase price. See, e.g., Midlantic Nat'l Bank v. Peerless Ins. Co., 253 N.J.Super. 137, 143, 601 A.2d 243 (App.Div.1992) (legislation should be read as a whole).
RISA is "part of a package of laws designed to protect consumers from overreaching by others, to protect consumers from overextending their own resources and also to promote the availability of financing to purchase various goods and services." Girard Acceptance Corp. v. Wallace, 76 N.J. 434, 439, 388 A.2d 582 (1978). RISA defines a "retail installment contract" as
any contract, other than a retail charge account or an instrument reflecting a sale pursuant thereto, entered into in this State between a retail seller and a retail buyer evidencing an agreement to pay the retail purchase price of goods or services, which are primarily for personal, family or household purposes, or any part thereof, in two or more installments over a period of time. This term includes a security agreement, chattel mortgage, conditional sales contract, or other similar instrument and any contract for the bailment or leasing of goods by which the bailee or lessee agrees to pay as compensation a sum substantially equivalent to or in excess of the value of the goods, and by which it is agreed that the bailee or lessee is bound to become, or has the option of becoming, the owner of such goods upon full compliance with the terms of such retail installment contract.
[N.J.S.A. 17:16C-1(b).]
The statute creates a three-part test for determining whether a contract is a "retail installment contract." First, the contract must be entered into between a retail seller and a retail buyer. Second, the transaction must reflect an exchange for goods or services, which are primarily for personal, family, or household purposes. Third, the contract must evidence an agreement to pay the retail purchase price of goods or services in two or more installments over a period of time. N.J.S.A. 17:16C-1(b).
Here, all three elements are not met. First, the rent-to-own contracts were not contracts "entered into in this State between a retail seller and a retail buyer." RISA defines a "retail seller" as:
a person who sells or agrees to sell goods[[12]] or services under a retail installment contract or a retail charge account to a retail buyer, and shall include a motor vehicle installment seller.
[N.J.S.A. 17:16C-1(c).]
A "retail buyer" is defined as:

*1011 a person who buys or agrees to buy goods or services from a retail seller, not for the purpose of resale, pursuant to a retail installment contract or a retail charge account.
[N.J.S.A. 17:16C-1(d).]
These definitions are circular because they refer back to the phrase "retail installment contract," which is a separately defined term under RISA. As will be set forth below, we do not find that a "retail installment contract" was entered into by these parties and, therefore, they do not qualify as a retail buyer and seller. Moreover, the record-in particular the rent-to-own contracts between Perez and Rent-A-Center, and the analysis of Rent-A-Center's business-does not reflect that Rent-A-Center's purpose is to sell or agree to sell goods under retail installment contracts. That some of those contracts ultimately may result in a sale is irrelevant.
The third element of the statutory test has also not been met. The contracts between plaintiff and defendant do not "evidenc[e] an agreement to pay the retail purchase price of goods or services ... in two or more installments over a period of time." Perez never bound herself to pay the retail price over a period of time. In fact, she could return the items at any time and her payments would stop. It is undisputed that Perez was under no obligation to purchase the items she rented-to-own. The contracts are clear on that point. Simply stated, the rent-to-own contracts between Perez and Rent-A-Center do not fit RISA's definition of a "retail installment contract."
We are aware that the final clause of the statutory definition provides that "retail installment contracts" encompass leases with an "option" to purchase. Specifically, RISA provides that the term "retail installment contract"
includes ... any contract for the ... leasing of goods by which the ... lessee agrees to pay as compensation a sum substantially equivalent to or in excess of the value of the goods, ... and by which it is agreed that the ... lessee ... has the option of becoming, the owner of such goods upon full compliance with the terms of such retail installment contract.
[N.J.S.A. 17:16C-1(b).]
The contracts between the parties, however, do not reflect an absolute and unequivocal obligation on the part of Perez to purchase the items she leased or even be bound to the lease for any period of time. Even though Perez qualifies as a lessee with an option of becoming the owner of the goods, she never agreed to pay anything more than each individual weekly payment.
Hence, we are satisfied that the contracts between Perez and Rent-A-Center do not constitute "retail installment contracts" as defined by RISA and affirm the conclusion reached by the Law Division.
We are aware of only one published case in this State addressing whether rent-to-own contracts fall within RISA's definition of retail installment contract. Green v. Cont'l Rentals, 292 N.J.Super. 241, 678 A.2d 759 (Law Div.1994). In Green, the plaintiffs alleged, among other things, that their rent-to-own contracts with the defendant were subject to RISA. Id. at 245, 678 A.2d 759. The contracts in Green were similar in their general nature, as well as in their specific terms, to the contracts between Perez and Rent-A-Center.
Each agreement provided that the customer is the "renter" or "lessee" of the property; that the customer does not own the merchandise and will not own it unless she makes the appropriate number of payments or chooses early to pay the full amount due; that if the customer *1012 opts to purchase early, she would be credited with forty percent of all payments made towards the purchase price; that ownership will be obtained by renewing the lease for the specified number of weekly or monthly lease terms; that the lease is renewed for an additional term at the end of each term by making payment of the next rental payment; that if all the renewal payments are made, the customer will become the owner of the property without the payment of any additional consideration;[[13]] that the customer is fully responsible for the loss, theft, or destruction of the property from all causes; that the customer may terminate the agreement, at any time, by returning the property in its present condition and by payment of all rental payments then due; that at Continental's option, the agreement terminates upon the customer's failure to renew the lease by making the rental payment next due.
[Id. at 246, 678 A.2d 759.]
Viewing the transactions in "a realistic and common sense way," looking "beyond form to identify the substance of the transaction[s]," and penetrating the "technique" to "reach the economic verity of the transaction," the court concluded that the transactions were sales agreements, not leases. Id. at 252-253, 678 A.2d 759. Therefore, the court held that the rent-to-own contracts were retail installment contracts governed by RISA. Id. at 253, 257, 678 A.2d 759.
Green's reasoning is open to some criticism. The Green opinion did not perform a careful, text-based analysis of RISA's definition of a retail installment contract and much of the opinion focuses instead on whether the federal Truth in Lending Act (TILA), 15 U.S.C.A. § 1601 et seq., applied to rent-to-own contracts, and a comparison between RISA and TILA. Id. at 247-252, 678 A.2d 759. Green's discussion of TILA is irrelevant to the case before us. In addition, based upon an amended regulation issued by the Federal Reserve Board, the Third Circuit Court of Appeals subsequently rejected Green's conclusion that TILA applied to rent-to-own contracts. See Ortiz v. Rental Mgmt., Inc., 65 F.3d 335, 338-342 (3d Cir.1995). Green is unpersuasive. We are satisfied that proper statutory analysis supports the conclusion that the rent-to-own contracts between plaintiff and defendant are not "retail installment contracts" as defined by RISA.
We note that the parties expended substantial effort discussing the law of other jurisdictions. The net result of that analysis is that New Jersey is exceptional because it has not adopted a statute designed exclusively to regulate the rent-to-own industry.
Given this situation, we attach no relevance to the out-of-state statutes and case law relied upon by the parties and by amici. The parties identify no jurisdiction in which the statutory language of a retail installment statute matches that of New Jersey.[14]

*1013 III.
In the alternative, we conclude that even if RISA applied to Rent-A-Center's rent-to-own contracts the plaintiff cannot succeed on this appeal. The motion judge held that New Jersey's criminal usury statute, N.J.S.A. 2C:21-19, did not apply to the parties' rent-to-own contracts. He concluded that even if RISA applied to the contracts,[15] Perez would not be entitled to relief if she could not establish that Rent-A-Center had violated RISA by charging interest greater than the 30% per annum permitted under the criminal usury statute. Based upon these rulings, the judge granted summary judgment in Rent-A-Center's favor. We agree with those rulings and affirm the judge's decision.
Perez, joined by amici, contends that RISA incorporates the protections of the criminal usury statute, N.J.S.A. 2C:21-19, and prohibits Rent-A-Center from charging a time-price differential greater than 30% per annum.
The phrase "time-price differential" means
a figure representing the difference between the cash price of an item and the total cost of purchasing that item on credit. Method by which seller charges one price for immediate cash payment and a different (advance in) price when payment is made at future date or in installments and the former is the cash price and the latter the "time-price" or credit price and difference in price is the time-price differential."
[Black's Law Dictionary 1032 (6th ed.1991).]
See also N.J.S.A. 17:16C-1(l) (RISA's definition of time-price differential). The term "time-price differential" measures the interest charged on items purchased on credit. However, the law accords different treatment to "time-price differentials" charged in connection with sales transactions and "interest" charged in connection with loans or forbearances of money.
Rent-A-Center maintains that the judge reached the correct conclusion on the usury issue. It contends that the parties' rent-to-own contracts were not subject to any usury laws because they were not loans or forbearances of money, and because any payment of interest was dependent upon the will of the borrower. Rent-A-Center further contends that New Jersey subscribes to the time-price differential doctrine that places sales transactions, as opposed to loans and forbearances of money, beyond the reach of usury statutes.
As it is a question of statutory interpretation we review this issue de novo. Manalapan Realty, supra (140 N.J. at 378, 658 A.2d 1230). We hold that the criminal usury statute, N.J.S.A. 2C:21-19, does not apply to sales transactions, including retail installment sales governed by RISA, nor does it apply to the agreements between the parties in this case. Accordingly, we affirm the Law Division's grant of summary judgment.
Perez's argument seeking to apply the criminal usury statute is based upon legislative history, the purpose of RISA, and the 1981 amendments to RISA and the criminal usury statute. The argument is unpersuasive. The 1981 amendments to RISA and the criminal usury statute were not intended to incorporate the criminal usury statute's interest rate limitations into RISA. Any such conclusion would be contrary to judicial precedent.
*1014 New Jersey courts have repeatedly held that the civil usury statute, N.J.S.A. 31:1-1, does not apply in the context of time-price differentials calculated with respect to sales transactions. The civil usury statute applies only in the context of loans or forbearances of money. Sliger v. R.H. Macy & Co., Inc., 59 N.J. 465, 468-469, 283 A.2d 904 (1971); Saul v. Midlantic Nat'l Bank/South, 240 N.J.Super. 62, 70-75, 572 A.2d 650 (App.Div.), certif. denied, 122 N.J. 319, 585 A.2d 338 (1990); Steffenauer v. Mytelka & Rose, Inc., 87 N.J.Super. 506, 510-517, 210 A.2d 88 (Ch.Div.1965), aff'd 46 N.J. 299, 216 A.2d 585 (1966). In Sliger, 59 N.J. at 468-469, 283 A.2d 904 (citations omitted), the Court stated:
The overwhelming majority of courts have held that if there is an agreement between the seller and buyer stating a cash price and, in the alternative, a credit price, the transaction, if bona fide, does not involve usury, even though the difference between the credit and cash price if considered interest would be usurious. The reason most frequently given for this conclusion is that an increase in price for a credit sale over the cash sale price is not a loan or forbearance of money.
Sliger went on to hold that revolving charge accounts were an example of a time-price differential, and not a loan or forbearance. Therefore, revolving charge accounts were not subject to the state's usury laws. Id. at 468-470, 283 A.2d 904.
Similarly, in Steffenauer, supra (87 N.J.Super. at 510-512, 210 A.2d 88), the Chancery Division stated:
The general rule of the majority of jurisdictions with respect to charges in transactions such as that under investigation here is stated in an annotation in 143 A.L.R. 238[, 242] (1943) as follows:
"It is well settled that where the contract of conditional sale is bona fide and the finance charge or other similar charge is included therein as a part of the total `time' or credit price of the chattel which the purchaser thereby agrees to pay upon a deferred payment basis, the finance charge does not constitute usury, even though such charge, if considered as interest, would be in excess of the highest lawful interest upon the cash purchase price for the time payment thereof is deferred under the contract, provided of course that the transaction was what it purported to be and not in fact a loan." ...
Courts adopting the majority view usually exclude transactions of this nature from the ambit of the general usury statutes because of the real nature of the transaction involved. A good expression of a general approach is found in General Motors Acceptance Corp. v. Weinrich, 218 Mo.App. 68, 262 S.W. 425 (App.Ct.1924), where it was stated:
"A loan may be cloaked in the outward form and appearance of a purchase, in which case that will not change the substance of the transaction or hide the usury. But if there is a real and bona fide purchase, not made as the occasion or pretext for a loan, the transaction will not be usurious even though the sale be for an exorbitant price, and a note is taken, at legal rates, for the unpaid purchase money. The reason is that the statute against usury is striking at and forbidding the exaction or receipt of more than a specified legal rate for the hire of money and not of anything else; and a purchaser is not like the needy borrower, a victim of a rapacious lender, since he can refrain from the purchase if he does not choose to pay the price asked by the seller. So that a sale in good faith of property, merchandise, or of an indorsement, or guaranty, or even *1015 of credit, if the seller has no other interest in the transaction, is valid and not open to the objection of usury whatever the price."
Steffenauer went on to hold that the civil usury statute was not applicable to a conditional sales contract for the sale of goods for commercial purposes. Id. at 516-517, 210 A.2d 88. The sale was not covered by RISA because the goods sold were for a commercial rather than a household purpose. Nevertheless, the court discussed RISA and explained that, through RISA's incorporation of the time-price differential doctrine, the Legislature had adopted a policy of exempting retail installment sales from the civil usury statute. Id. at 514-516, 210 A.2d 88.
Finally, and most recently, in Saul, supra (240 N.J.Super. at 73, 572 A.2d 650), we stated:
RISA effectively codifies the "time price doctrine" and authorizes those persons subject to RISA to collect finance charges in an amount agreed to between buyer and seller without regard to the ceiling imposed by the general usury statute.
Even more emphatically, we stated: "Installment sales contracts... simply are not governed by the general usury statute." Id. at 75, 572 A.2d 650. Saul went on to hold that an installment sale contract for an automobile, in the total amount of $15,000 (not covered by RISA because it was in excess of $10,000), was exempt from the civil usury statute because it was a sales transaction and not a loan or forbearance. Id. at 70-75, 572 A.2d 650.
Significantly, Saul was decided in 1990, after the 1981 amendment to RISA upon which Perez relies. Therefore, the 1981 amendment to RISA cannot be viewed as a repudiation of the time-price differential doctrine, exempting sales transactions from the state's usury laws. Although the Supreme Court has referred to time-price differentials as the equivalent of interest, Singer, supra (65 N.J. at 409, 323 A.2d 457), New Jersey courts have been equally clear that time-price differentials are not subject to the interest rate limitations of the civil usury statute. Sliger, supra (59 N.J. at 468-469, 283 A.2d 904); Saul, supra (240 N.J.Super. at 70-75, 572 A.2d 650); Steffenauer, supra (87 N.J.Super. at 510-517, 210 A.2d 88).
There are two requirements for a transaction to fall within the time-price differential exception to the state's usury laws: (1) the facts reveal an intent between the parties to consummate an actual purchase and sale (as opposed to a loan or forbearance of money); and (2) the purchaser must be fully aware of what he is doing and must have an opportunity to make an intelligent choice between buying the product or service for less now rather than more later. Id. at 512, 210 A.2d 88.
Here, the transactions between Perez and Rent-A-Center were essentially for the rental of goods. There was no loan or forbearance of money. Therefore, the transactions fall within the time-price differential exception to the usury laws, and the state's usury laws do not apply.
Sliger, Saul, and Steffenauer were concerned with the state's civil usury statute, N.J.S.A. 31:1-1(a). They did not consider application of the criminal usury statute to time-price differentials charged in connection with retail installment sales.
Perez contends that the criminal usury statute, N.J.S.A. 2C:21-19(a), should be deemed applicable to the parties' transactions even if the civil usury statute is not. For this contention, she repeats her argument about the intent of the 1981 legislation. In addition, she relies on a footnote in Saul, supra (240 N.J.Super. at 66, n. 1, 572 A.2d 650), in which we responded to an *1016 argument made by the defendant therein that "there is no statute regulating interest rates of retail installment sales of automobiles where loans exceed $10,000" by stating that, in fact, such loans would be limited "by reason of the criminal usury statute."
We perceive no reason to limit the reasoning of Sliger, Saul, and Steffenauer to civil usury. The reasoning of those cases is as applicable to criminal usury as it is to civil usury. Like the civil usury statute, the criminal usury statute applies only to loans or forbearances of money. Compare N.J.S.A. 31:1-1(a) with N.J.S.A. 2C:21-19(a). The transactions at issue in the cases just discussed were sales transactions, and not loans or forbearances of money. Thus, we perceive no principled basis upon which to distinguish Sliger, Saul, and Steffenauer, or to conclude that the criminal usury statute applies to the retail installment sales at issue in this case.
In light of Sliger, Saul, and Steffenauer, the legislative history cited by plaintiff loses persuasive power. If, through the 1981 amendments to RISA and the criminal usury statute, the Legislature had intended for the criminal usury statute to apply to RISA sales transactions, it would have been necessary for the Legislature to repudiate the holdings in Sliger and Steffenauer (Saul had not yet been decided). The record reveals no evidence of such an intent on the part of the Legislature.
The footnote from Saul upon which plaintiff relies is also unpersuasive regarding a determination on whether the criminal usury statute applies to sales transactions in general, or RISA transactions in particular. The footnote is ambiguous. In it, we merely noted in passing that the criminal usury statute would apply to loans in excess of $10,000 where the loan was secured in connection with the retail installment sale of an automobile. Saul, supra (240 N.J.Super. at 66, n. 1, 572 A.2d 650). To the extent we appeared to be suggesting in dicta that the criminal usury statute applies to purely sales transactions, and not merely loans and forbearances of money, we reject that interpretation.
Finally, even if we were to hold that time-price differentials charged in connection with retail installment sales are subject to the interest rate limitations of the criminal usury statute, that would not mean that plaintiff has a private right of action to enforce the criminal usury statute by alleging a violation of RISA. RISA does not provide that violation of the criminal usury statute constitutes an independent violation of RISA.
Affirmed.

APPENDIX A
Like New Jersey, Wisconsin does not have a rent-to-own statute. Instead, Wisconsin treats rent-to-own contracts as consumer credit transactions subject to the Wisconsin Consumer Act. See Burney v. Thorn Americas, Inc., 944 F.Supp. 762, 766-776 (E.D.Wis.1996), reconsid. granted in part, 970 F.Supp. 668 (E.D.Wis.1997); LeBakken Rent-to-Own v. Warnell, 223 Wis.2d 582, 589 N.W.2d 425, 428-431 (App.1998); Rent-A-Center, Inc. v. Hall, 181 Wis.2d 243, 510 N.W.2d 789, 792-795 (App.1993), review denied, 515 N.W.2d 715 (Wis.1994); Palacios v. ABC TV & Stereo Rental of Milwaukee, Inc., 123 Wis.2d 79, 365 N.W.2d 882, 885-887 (App.), review denied, 122 Wis.2d 783, 367 N.W.2d 223 (1985).
Minnesota has a rent-to-own statute, called a "Rental Purchase Agreement Act." Minn.Stat. Ann. §§ 325F.84 to 325F.97 (2004). However, the statute is non-exclusive. Rent-to-own contracts are also subject to Minnesota's Consumer *1017 Credit Sales Act and General Usury Statute. See Fogie v. THORN Americas, Inc., 95 F.3d 645, 648, 650-654 (8th Cir.1996), cert. denied, 520 U.S. 1166, 117 S.Ct. 1427, 137 L.Ed.2d 536 (1997); Miller v. Colortyme, Inc., 518 N.W.2d 544, 547-551 (Minn.1994). Minnesota law defines the phrase "sale of goods" to include rent-to-own contracts, and uses "option" to purchase language which is similar but not identical to RISA. Minn.Stat. Ann. § 325G.15(5) (2004).
Vermont delegates authority to the attorney general to "adopt by rule standards for the full and conspicuous disclosure to consumers of the terms of rent-to-own agreements." Vt. Stat. Ann. tit. 9, § 41b(a) (2003). The Vermont attorney general has adopted such regulations. Vt.Code R. 06.031.015 (2004).[16]
Virtually every other state in the nation, as well as the District of Columbia, has adopted a statute explicitly regulating rent-to-own contracts as a distinct transactional form. The only exceptions are New Jersey, North Carolina and Wisconsin. See Ala.Code §§ 8-25-1 to 8-25-6 (2003); Alaska Stat. §§ 45.35.010 to 45.35.099 (2003); Ariz.Rev.Stat. §§ 44-6801 to 44-6814 (2004); Ark.Code Ann. §§ 4-92-101 to 4-92-107 (2004); Cal. Civil Code §§ 1812.620 to 1812.649 (2004); Colo.Rev.Stat. Ann. §§ 5-10-101 to X-XX-XXXX (2004); Conn. Gen.Stat. §§ 42-240 to 42-253 (2004); Del.Code Ann. tit. 6, §§ 7601 to 7616 (2003); D.C.Code Ann. §§ 42-3671.01 to 42-3671.14 (2004); Fla. Stat. Ann. §§ 559.9231 to 559.9241 (2004); Ga.Code. Ann. §§ 10-1-680 to 10-1-689 (2004); Haw.Rev.Stat. Ann. §§ 481M-1 to 481M-18 (2003); Idaho Code §§ 28-36-101 to XX-XX-XXX (2004); 815 Ill. Comp. Stat. §§ 655/0.01 to 655/5 (2004); Ind.Code §§ 24-7-1-1 to 24-7-9-7 (2004); Iowa Code §§ 537.3601 to 537.3624 (2004); Kan. Stat. Ann. §§ 50-680 to 50-690 (2003); Ky.Rev.Stat. Ann. §§ 367.976 to 367.985 (2004); La.Rev.Stat. Ann. §§ 9:3351 to 9:3362 (2004); Me.Rev.Stat. Ann. tit. 9-A, §§ 11-101 to 11-122 (2004); Md.Code Ann., Commercial Law §§ 12-1101 to 12-1112 (2004); Mass. Gen. Laws ch. 93, §§ 90 to 93 (2004); Mich. Comp. Laws §§ 445.951 to 445.970 (2004); Minn.Stat. Ann. §§ 325F.84 to 325F.97 (2004); Miss.Code Ann. §§ 75-24-151 to XX-XX-XXX (2004); Mo. Ann. Stat. §§ 407.660 to 407.665 (2004); Mont.Code Ann. §§ 30-19-101 to XX-XX-XXX (2003); Neb.Rev.Stat. §§ 69-2101 to 69-2119 (2004); Nev.Rev.Stat. Ann. 597.010 to 597.110 (2004); N.H.Rev.Stat. Ann. §§ 358-P:1 to 358-P:12 (2004); N.M. Stat. Ann. §§ 57-26-1 to 57-26-12 (2004); N.Y. Personal Property Law §§ 500 to 507 (McKinney 2004); N.D. Cent.Code §§ 47-15.1-01 to 47-15.1-08 (2003); Ohio Rev.Code Ann. §§ 1351.01 to 1351.09 (2004); Okla. Stat. Ann. tit. 59, §§ 1950 to 1957 (2004); Or.Rev.Stat. §§ 646.245 to 646.259 (2004); 42 Pa. Cons.Stat. Ann. §§ 6901 to 6911 (2004); R.I. Gen. Laws §§ 6-44-1 to 6-44-10 (2003); S.C.Code Ann. §§ 37-2-701 to 37-2-714 (2003); S.D. Codified Laws §§ 54-6A-1 to 54-6A-10 (2004); Tenn.Code Ann. §§ 47-18-601 to XX-XX-XXX (2004); Tex. Business and Commerce Code Ann. §§ 35.71 to 35.74 (2004); Utah Code Ann. §§ 15-8-1 to 15-8-12 (2004); Va.Code Ann. §§ 59.1-207.17 to 59.1-207.27 (2004); Wash. Rev.Code Ann. §§ 63.19.010 to 63.19.901 (2005); W. Va.Code §§ 46B-1-1 to 46B-8-3 (2004); Wyo. Stat. Ann. §§ 40-19-101 to XX-XX-XXX (2004).
*1018 Commentators have criticized some state laws purporting to regulate the rent-to-own industry. They contend that the legislation was promoted by rent-to-own operators as a means to evade consumer protections generally applicable to credit sales and retail installment sales. See Lynn Drysdale and Kathleen E. Keest, The Two-Tiered Consumer Financial Services Marketplace: The Fringe Banking System and its Challenge to Current Thinking About the Role of Usury in Today's Society, 51 S.C.L.Rev. 589, 615 (Spring 2000); Creola Johnson, Welfare Reform and Asset Accumulation: First We Need a Bed and a Car, 2000 Wis. L.Rev. 1221, 1256-1257 (2000); James P. Nehf, Effective Regulation of Rent-to-Own Contracts, 52 Ohio State L.J. 751, 753, 821-822 (1991).
NOTES
[1] The complaint had sought class action certification, but that issue was not decided before the complaint's dismissal.
[2] Saul v. Midlantic National Bank/South, 240 N.J.Super. 62, 572 A.2d 650 (App.Div.1990).
[3] Steffenauer v. Mytelka & Rose, Inc., 87 N.J.Super. 506, 210 A.2d 88 (Ch.Div.1965), aff'd 46 N.J. 299, 216 A.2d 585 (1966).
[4] The original complaint is not in the appellate record.
[5] Plaintiff's attack on rent-to-buy arrangements might eliminate the availability of that option to persons ineligible for loans or who cannot afford to purchase a product outright or qualify under a retail sales installment contract.
[6] The "weekly rate" shown in the table was derived from the rental contracts. The "weekly rate" is the weekly rental rate without tax or other fees (such as an "optional liability waiver fee," which the record reflects Perez often paid).
[7] The "total rent-to-own cost" shown in the table was derived from the rental contracts. The contracts assume all payments are made on a weekly basis, and include payment of the contract's "fair market value" cost of the product at the end of the rental period; the figure does not include tax.
[8] The "amount Perez paid" was derived from the rental summaries provided in the record (the amount indicated under the heading Rent Paid). There is no rental summary for the furniture rental. Therefore, the "amount Perez paid" for the furniture rental was derived by adding the rent payments (exclusive of tax and other fees) identified in the rental summary.
[9] Amicus curiae, the National Consumer Law Center, the Consumer Federation of America, NJPIRG Citizen Lobby, U.S. PIRG, and Consumers League of New Jersey, argue in support of Perez's position.
[10] Entry of the judgment based upon the court-approved settlement agreement had the effect of superceding the initial "final judgment" on the merits. Whether or not the second final judgment explicitly stated this effect is irrelevant. The parties in settling the matter, and the court in approving the settlement, clearly intended to supercede the initial final judgment, and the court effected that result through entry of the second final judgment.
[11] Plaintiff also cites a California case, Stonewall Ins. Co. v. City of Palos Verdes Estates, 46 Cal.App.4th 1810, 54 Cal.Rptr.2d 176, 191 (1996), but upon a thorough reading of the case it is evident that California's law on collateral estoppel differs significantly from the law of this State and we find the case unpersuasive.
[12] RISA defines "goods" as

all chattels personal which are primarily for personal, family or household purposes, including merchandise certificates and coupons to be exchanged for goods or services, having a cash price of $10,000.00 or less, but not including money or other choses in action. Goods shall not include chattels personal sold for commercial or business use.
[N.J.S.A. 17:16C-1(a).]
The items Perez rented-to-own from Rent-A-Center fit within this statutory definition of "goods."
[13] In the case under review, to become the owner of the merchandise rented-to-own, Perez was required to make the specified number of rental payments plus an additional payment at the end of the rental term. Unlike in Green, the "expectation of the customer" in this case after making all the rental payments was not ownership of the property, but rather the expectation was the return of the property or the payment of additional consideration to acquire ownership. Green, supra (292 N.J.Super. at 253, 678 A.2d 759).
[14] Amici contend that, with the exception of Wisconsin, Minnesota and Vermont, most state regulation of the rent-to-own industry is inadequate. See Appendix A for discussion of other state legislation.
[15] As discussed in Point I, the trial judge had held that rent-to-own contracts were not retail installment sales.
[16] Vermont also has a separate statute governing rent-to-own agreements for assistive devices (products used or designed to be used to increase, maintain, or improve any functional capability of an individual with disabilities). Vt. Stat. Ann. tit. 9, § 41c.