892 A.2d 1255

HILDA PEREZ, ON BEHALF OF HERSELF AND ALL OTHERS SIMILARLY SITUATED, PLAINTIFF–APPELLANT, v. RENT–A–CENTER, INC., DEFENDANT–RESPONDENT.

Argued November 7, 2005—Decided March 15, 2006.

*Seth R. Lesser* argued the cause for appellant (*Locks Law Firm, Williams Cuker & Berezofsky* and *William A. Riback,* attorneys; *Mr. Lesser, Mr. Riback* and *Mark R. Cuker,* on the briefs).

*Ezra D. Rosenberg* argued the cause for respondent (*Dechert,* attorneys; *Mr. Rosenberg, David A. Kotler* and *Thomas Kane,* on the briefs).

*Melville D. Miller, Jr.,* President, argued the cause for amicus curiae Legal Services of New Jersey (*Mr. Miller,* attorney; *David G. McMillin* and *Christopher Hill,* on the briefs).

*Michaelene Loughlin* submitted a brief on behalf of amicus curiae Consumers League of New Jersey (*Loughlin & Latimer,* attorneys).

*Steven L. Wittels* submitted a brief on behalf of amici curiae National Consumer Law Center, Consumer Federation of Amer-

ica, New Jersey Public Interest Research Group Citizen Lobby and U.S. Public Interest Research Group (*Sanford Wittels & Heisler*, attorneys).

Justice LONG delivered the opinion of the Court.

On this appeal, we have been asked to determine whether rent-to-own contracts are subject to certain consumer protection statutes. Specifically, the parties question whether the Retail Installment Sales Act ("RISA"), *N.J.S.A.* 17:16C–1 to –61; the interest rate cap in the criminal usury statute, *N.J.S.A.* 2C:21–19; and the Consumer Fraud Act ("CFA"), *N.J.S.A.* 56:8–1 to –135, apply to such arrangements. The trial judge answered those questions in the negative and the Appellate Division affirmed. Having concluded, based on the plain language of the relevant statutes and established principles of statutory interpretation, that Rent–A–Center's rent-to-own contracts are subject to each of the denominated acts, we now reverse.

I

The rent-to-own industry, in its present iteration, is generally traced back to a "retail appliance store owner whose customers were being denied credit to purchase washers and dryers." Susan Lorde Martin & Nancy White Huckins, *Consumer Advocates vs. the Rent–to–Own Industry: Reaching a Reasonable Accomodation*, 34 *Am. Bus. L.J.* 385, 385 (1997). Today, rent-to-own is a multi-billion dollar business that consists of

dealers that rent furniture, appliances, home electronics, and jewelry to consumers. Consumers enter into a self-renewing weekly or monthly lease for the rented merchandise, and are under no obligation to continue payments beyond the current weekly or monthly period. At the end of each period, the consumer can continue to rent by paying for an additional period, or can return the merchandise. The lease provides the option to purchase the goods, either by continuing to pay rent for a specified period of time, usually 12 to 24 months, or by early payment of some specified proportion, usually 50 to 60 percent, of the remaining lease payments.

Rent-to-own transactions offer immediate access to household goods for a relatively low weekly or monthly payment, typically without any down payment or credit check. These terms are attractive to many consumers who cannot afford a

cash purchase, may be unable to qualify for credit, and are unwilling or unable to wait until they can save for a purchase.

[Federal Trade Commission, *Bureau of Economics Staff Report: Survey of Rent-to-Own Customers* 1–2 (April 2000)(footnotes omitted)(hereinafter *FTC Report* ).]

Generally, rent-to-own customers engage in such transactions in order to possess consumer goods that they need and cannot obtain through ordinary means. Price Waterhouse LLC, *THORN Americas—New Jersey Customer Survey Report* III–17 (November 19, 1996)(hereinafter *Price Waterhouse Survey* )(Rent–A–Center survey showing over 72% of New Jersey Rent–A–Center customers could not afford to purchase item at traditional retail store); Kathleen E. Keest et al., *Interest Rate Regulation Developments: High–Cost Mortgages, Rent–to–Own Transactions, and Unconscionability,* 50 *Bus. Law.* 1081, 1086 (1995)("Rent-to-own agreements are typically entered into by customers who can neither afford to purchase the merchandise outright nor obtain credit."). Indeed, nationally, rent-to-own customers are more likely to be "African American, younger, less educated, have lower incomes, have children in the household, rent their residence, live in the South, and live in non-suburban areas." *FTC Report, supra,* at ES–1.

Although some consumers enter into rent-to-own transactions to fill a temporary need or to try a product out before buying it, *id.* at 2, the vast majority are the working poor whose incomes are on the margin of economic stability; they engage in rent-to-own for ownership purposes. *Id.* at ES–2 ("Sixty-seven percent of customers intended to purchase the merchandise when they began the rent-to-own transaction."); Lynn Drysdale & Kathleen E. Keest, *The Two–Tiered Consumer Financial Services Marketplace: The Fringe Banking System and its Challenge to Current Thinking About the Role of Usury in Today's Society,* 51 *S.C. L.Rev.* 589, 635–36 (2000); *see also Price Waterhouse Survey, supra,* at III–17. In fact, studies, including those by Rent–A–Center, have concluded that between 64% and 70% of all rent-to-own merchandise is ultimately purchased by the customers. *FTC Report, supra,* at ES–1; Patrick A. Gaughan, Ph.D. & Henry L. Fuentes,

C.P.A., *An Analysis of the Product Offerings of Rent–A–Center, Inc. Perez et al. v. Rent–A–Center, Inc.* 8 (Oct. 3, 2003).

Rent–A–Center is the nation's largest rent-to-own company, Gaughan, *supra*, at 4, with approximately fifty stores in New Jersey alone. *Id.* at 9–10. Between March 2001 and May 2002, Plaintiff, Hilda Perez, entered into five rent-to-own contracts with Rent–A–Center in order to become the owner of used furniture, a used washer and new dryer, a used DVD player and television, a new computer, and a used large screen television and cabinet. *Perez v. Rent–A–Center, Inc.*, 375 *N.J.Super.* 63, 70, 866 *A.*2d 1000 (App.Div.2005). Those transactions were documented by the Appellate Division as follows:

| Agreement Number | Date | Product | Cash Price | Weekly Rate[1] | Weeks to Ownership | Total Rent-to-Own Cost[2] | Amount Perez Paid[3] |
|---|---|---|---|---|---|---|---|
| 34413833 | 03/03/01 | furniture | $1,951.43 | $38.99 | 91.4 | $3,902.76 | $2,573.34 |
| 34414122 | 04/23/01 | washer/dryer | 987.47 | 21.99 | 95.3 | 1,984.90 | 1,418.71 |
| 34414671 | 08/03/01 | DVD/TV | 1,160.99 | 22.99 | 92.0 | 2,321.99 | 1,264.39 |
| 34415383 | 11/17/01 | computer | 2,235.48 | 42.99 | 95.0 | 4,470.96 | 1,934.49 |
| 34416433 | 05/06/02 | big-screen TV & cabinet | 2,966.35 | 45.99 | 120.0 | 5,932.71 | 965.79 |
| Totals | | | $9,301.72 | $172.95 | | $18,613.32[4] | $8,156.72 |

[*Id.* at 70, 866 *A.*2d 1000.]

The contract for the washer and dryer is representative of all others. It states:

---

[1] The "weekly rate" is the weekly rental rate without tax or other fees (such as an "optional liability waiver fee" that the record reflects Perez often paid).

[2] The contracts assume all payments are made on a weekly basis, and include payment of the contract's "fair market value" cost of the product at the end of the rental period; the figure does not include tax.

[3] The "amount Perez paid" was derived from the rental summaries provided in the record (the amount indicated under the heading Rent Paid). There is no rental summary for the furniture rental. Therefore, the "amount Perez paid" for the furniture rental was derived by adding the rent payments (exclusive of tax and other fees) identified in the rental summary.

[4] The "$28,613.32" stated by the Appellate Division is a typographical error. The correct total is $18,613.32.

## THIS IS A RENTAL AGREEMENT ONLY

This is a rental agreement only. You will not acquire any equity in the property by making rental payments. You have not agreed to purchase this property, and will not acquire any ownership rights in it unless you have, at your option, paid the total of rental payments plus the option payment necessary to acquire ownership.

. . . .

4. OWNERSHIP: We own the property you are renting. You will not acquire any ownership rights in the property unless you have, at your option, paid the total of payments plus the purchase option price necessary to acquire ownership as set forth below, or exercise the early purchase option described below. If you want to purchase this or similar property now, you may be able to get cash or credit terms from other sources which will result in a lower total cost than the rental payments, plus the purchase option price provided for below.

OPTION TO PURCHASE: If you renew this Agreement for 95.3 successive weeks, you will pay a total of $1,820.33 or if you renew this Agreement for 44.0 successive semi-months, you will pay a total of $1,793.07 or if you renew this Agreement for 22.0 successive months, you will pay a total of $1,671.12 and you will have the option to purchase the property for its then fair market value. For purpose of this option, this price will not exceed $164.57. Thus, in order to acquire ownership of this item, you must pay the total amount of $1,984.90 if you pay weekly rental payments, or $1,957.64 if you pay semi-monthly rental payments, or $1,835.69 if you pay monthly rental payments. Figures do not include tax.

COST OF RENTAL WITH OPTION TO PURCHASE: The difference between the amount of the cash price and the total amount of all the rental payments under this agreement is $997.43 if you pay weekly, or $970.17 if you pay semi-monthly, or $848.22 if you pay monthly, which includes the option to purchase price described above. Figures do not include tax.

5. OUR CASH PRICE FOR THIS PROPERTY is $987.47. This price may be different from the MSRP or other available retail prices.

6. EARLY PURCHASE OPTION: If you wish to purchase the rental property, you may do so at any time by the payment of 50% of the remaining rental payments calculated at that time, plus 50% of the option to purchase amount described above.

Under the contracts, Perez paid a pre-calculated weekly rental amount, a portion of which defrayed the price of the goods. She could return the goods at any time and stop making payments. However, in order to purchase them, Perez agreed that she would pay an amount equal to or in excess of their value along with a purchase option price. If Perez chose to purchase the rental property early, she was required to pay a prorated portion of the remaining rental payments and option price. Together, all the items Perez rented had a cash price of $9,301.72; however, if she

paid the weekly rates and the additional option payments, she would assume ownership having expended $18,613.32. The difference between the market value of the goods and their ultimate cost was Rent–A–Center's interest charge for the privilege of buying the products over time.[5] By May 2002, Perez had paid $8,156.72. It was at that point that she stopped paying.

Rent–A–Center thereafter filed a small claims complaint seeking money damages against Perez arising out of her failure to pay for or return the rental items.[6] *Perez, supra,* 375 *N.J.Super.* at 67, 866 *A.2d* 1000. In turn, Perez sued Rent–A–Center in the Superior Court, alleging that her rent-to-own contracts violated RISA and the CFA because the contracts imposed an interest rate in excess of the 30% permitted under the criminal usury statute. *Id.* at 68, 866 *A.2d* 1000. Rent–A–Center counterclaimed for breach of contract and conversion. *Ibid.* In 2004, Perez moved for partial summary judgment declaring the applicability of RISA and the usury cap, and Rent–A–Center filed a cross-motion for dismissal of the complaint. *Ibid.* The trial judge granted the relief sought by Rent–A–Center and dismissed Perez's complaint in its entirety. *Ibid.*

Perez appealed arguing (1) that Rent–A–Center was collaterally estopped from defending against the RISA claim;[7] (2) that RISA,

---

[5] The Appellate Division noted the following findings by Perez's expert:

James Hunt, an actuary, calculated interest rates for several of Perez's rental agreements with Rent–A–Center, assuming she made all payments contemplated by the agreements. He opined that: (1) for the washer and dryer, the annual interest rate was 79.9%; and (2) for the furniture, the annual interest rate was 82.7%. The annual interest rate for the DVD player fell somewhere between 79.9% and 82.7%. Hunt was of the opinion that interest rate calculations were valid even if the items were rented for only one week, as long as there remained the option to buy.

[*Perez v. Rent–A–Center, Inc.,* 375 *N.J.Super.* 63, 74, 866 *A.2d* 1000 (App.Div. 2005).]

[6] Although the record is somewhat unclear, Rent–A–Center appears to have voluntarily dismissed the small claims complaint. *See Perez, supra,* 375 *N.J.Super.* at 67, 866 *A.2d* 1000.

[7] In support she cited *Robinson v. Thorn Am., Inc.,* L–03697–94 (Law Div. Oct. 20, 1995), a class action law suit involving many of the same issues that are before us. *See infra* Part III.

by its plain terms, applies; and (3) that the usury limitations are applicable to Rent–A–Center's operations. The Appellate Division rejected Perez's collateral estoppel argument and ruled in favor of Rent–A–Center on the merits. We granted Perez's petition for certification, 183 *N.J.* 586, 874 *A.*2d 1105 (2005), along with the application of Legal Services of New Jersey and National Consumer Law Center et al., to appear as amicus curiae.

## II

Perez argues that Rent–A–Center is barred under the doctrine of collateral estoppel from defending against the RISA claim and that RISA and the usury cap are applicable to Rent–A–Center's contracts. She also contends that the Appellate Division erred in failing to separately address her CFA claim. Amici support Perez's arguments.

Rent–A–Center counters that because the prior litigation was settled, the doctrine of collateral estoppel does not apply; that its transaction with Perez constitutes a series of short-term leases to which neither RISA nor the usury statute applies; and that if RISA is held to apply, Perez cannot maintain a CFA claim.

## III

■ We turn first to Perez's procedural claim that Rent–A–Center is barred by the doctrine of collateral estoppel from arguing that its contracts are not governed by RISA. At the heart of that claim is the disposition in *Robinson v. Thorn Am., Inc.*, a case involving Rent–A–Center. There, the trial judge ruled on summary judgment that Rent–A–Center's contracts fit within RISA's definition of "retail installment contract." *See N.J.S.A.* 17:16C–1(b). Rent–À–Center appealed and the execution of the judgment was stayed. During the pendency of the appeal, the case settled. With the consent of the parties, the Appellate Division dismissed the case without prejudice and remanded it to the trial judge for further proceedings.

On remand, the details of the settlement were hammered out. Rent–A–Center consented to pay money damages to plaintiffs and to amend its New Jersey rental agreements to conform to RISA, on the condition that the settlement be construed neither as an admission nor as evidence of wrongdoing. After a hearing pursuant to *Rule* 4:32–4, final judgment was entered in accordance with the settlement, dismissing plaintiff's claims against Rent–A–Center "in their entirety, with prejudice and without costs to any party."

■ Perez argues that the summary judgment order entered in *Robinson* collaterally estops Rent–A–Center from relitigating the RISA issue. Under New Jersey law

[c]ollateral estoppel applies if the issue decided in the prior action is identical to the one presented in the subsequent action, if the issue was actually litigated—that is, there was a full and fair opportunity to litigate the issue—in the prior action, if there was a final judgment on the merits, if the prior determination was essential to the judgment, and if the party against whom preclusion is asserted was a party, or in privity with a party, to the proceeding.

[*Fama v. Yi*, 359 *N.J.Super.* 353, 359, 820 *A.2d* 65 (App.Div.), *certif. denied*, 178 *N.J.* 29, 834 *A.2d* 403 (2003)(citing *Pace v. Kuchinsky*, 347 *N.J.Super.* 202, 215, 789 *A.2d* 162 (App.Div.2002); *Barker v. Brinegar*, 346 *N.J.Super.* 558, 567, 788 *A.2d* 834 (App.Div.2002)).]

■ Although issue preclusion may be denied on equitable grounds even when the five elements of collateral estoppel are satisfied, *ibid.*, when they are not satisfied, the inquiry ends. The threshold concern here is whether the summary judgment in *Robinson* constituted a final judgment on the merits warranting issue preclusion. Rent–A–Center argues, and the Appellate Division agreed, that the summary judgment was effectively, if not explicitly, vacated by the later judgment dismissing plaintiff's claims in accordance with the settlement. The Appellate Division ruled:

Entry of the judgment based upon the court-approved settlement agreement had the effect of superceding the initial "final judgment" on the merits. Whether or not the second final judgment explicitly stated this effect is irrelevant. The parties in settling the matter, and the court in approving the settlement, clearly intended to supercede the initial final judgment, and the court effected that result through entry of the second final judgment.

[*Perez, supra,* 375 *N.J.Super.* at 77 n. 10, 866 *A.*2d 1000.]

Although we agree that collateral estoppel was properly rejected by the trial judge, some additional comments are in order.

█ It is well-established that the mere happenstance of settlement does not automatically warrant the conclusion that a prior judgment entered in a case has been vacated:

> Where mootness results from settlement ... the losing party has voluntarily forfeited his legal remedy by the ordinary processes of appeal or certiorari, thereby surrendering his claim to the equitable remedy of vacatur.... The denial of vacatur is merely one application of the principle that a suitor's conduct in relation to the matter at hand may disentitle him to the relief he seeks.
>
> ˊ ....
>
> ... Judicial precedents are presumptively correct and valuable to the legal community as a whole. They are not merely the property of private litigants and should stand *unless a court concludes that the public interest would be served by a vacatur.*
>
> [*U.S. Bancorp. Mortgage Co. v. Bonner Mall P'ship,* 513 *U.S.* 18, 25–26, 115 *S.Ct.* 386, 392, 130 *L.Ed.*2d 233, 242–43 (1994) (internal quotations and citations omitted)(emphasis added).]

█ In other words, the settlement of a case after the entry of judgment does not automatically relieve the party against whom the judgment was entered from its legal effects. In order to assure that that judgment will not be used against it in the future, the losing party should file a vacatur motion.[8] *Ibid.* Obviously, once a vacatur motion is granted, collateral estoppel will not apply, because the requisite judgment on the merits will be lacking. *Aetna Cas. & Sur. Co. v. Ply Gem Indus., Inc.,* 313 *N.J.Super.* 94, 107, 712 *A.*2d 717 (Law Div.1997)(holding a vacated judgment has no preclusive effect).

In *Robinson,* no motion was made to vacate the summary judgment and consequently no vacatur order was entered. Generally, that would end the matter because judicial precedents are

---

[8] When a case settles while on appeal, an appellate court, faced with an application to vacate the underlying judgment, should ordinarily stay its hand and remand the matter to the trial court for consideration of the vacatur request. *See U.S. Bancorp. Mortgage Co. v. Bonner Mall P'ship,* 513 *U.S.* 18, 29, 115 *S.Ct.* 386, 393, 130 *L.Ed.*2d 233, 244 (1994).

important to lawyers and judgments ordinarily should not be obliterated by implication. *U.S. Bancorp., supra,* 513 *U.S.* at 25–26, 115 *S.Ct.* at 392, 130 *L.Ed.*2d at 242–43. However, we agree with the Appellate Division that, despite the absence of an unequivocal vacatur order, the "Final Order and Judgment" entered upon the settlement in *Robinson* was intended to supercede the earlier partial summary judgment.

Indeed, the settlement order specifically references the summary judgment yet declares: "[T]his is a Final Order and Judgment for purposes of appeal." The order goes on to state that if "the Settlement is not consummated for any reason whatsoever, then the Final Order and Judgment shall be null and void *ab initio*, and of no force or effect, and that the matter shall be returned to the Appellate Division for continued pursuit of the appeal." That provision in turn, reflects ¶ 53 of the stipulation of settlement, which prescribes that in the event that the settlement is nullified, "the *Robinson* case shall stand in the same position, without prejudice, as if [the] stipulation had not been made or filed with the Court." The fair implication of that language is that the earlier summary judgment was to be considered void if the settlement stood but revived if it failed.

Most importantly, the settlement order states in ¶ 21:

This Order and Judgment and the Stipulation of Settlement and all papers related to them are not, and *shall not be construed to be, an admission by any of the Defendants of any liability or wrongdoing whatsoever, and shall not be offered as evidence of any such liability or wrongdoing in this or any future proceeding.*

In other words, the parties agreed that the settlement itself would not be used against Rent–A–Center either as an admission or by way of collateral estoppel. In the face of that language, it seems clear that they had no expectation that the earlier summary judgment would survive and continue to trigger issue preclusion. To be sure, the better course would have been for Rent–A–Center to move to vacate the earlier judgment. Nevertheless, we are satisfied that the settlement order was intended by the parties and the judge who approved it to operate to vacate the earlier summary judgment. In short, we hold that Rent–A–Center is not

collaterally estopped from defending against the RISA claim Perez has leveled against it.

## IV

We turn next to the merits and address the question of whether the rent-to-own contracts between Rent–A–Center and Perez are "retail installment contract[s]" within the meaning of RISA. *N.J.S.A.* 17:16C–1(b). We begin with that issue because, although RISA itself does not expressly contain an interest rate cap, Perez argues that it is the vehicle through which the Legislature imposed the 30% cap in the criminal usury statute[9] on retail installment sales.

## A.

Historically, the law treated the taking of interest in connection with the sale of goods as entirely different from the taking of interest on a loan of money per se. Indeed, in the nineteenth and early twentieth centuries, courts first distinguished between the two kinds of loans and decided that the latter required regulation but the former did not. *Beete v. Bidgood*, 7 B. & C. 453, 108 *Eng. Rep.* 792 (K.B.1827) (usury laws inapplicable to higher purchase price charged in exchange for buyer's ability to pay purchase price in installments over time); *Hogg v. Ruffner*, 1 *Black* 115, 66 *U.S.* 115, 118–19, 17 *L.Ed.* 38, 39–40 (1861)(same). The rationale behind those cases was the notion that the compulsion facing an individual who owes or needs money is much more compelling than that motivating a person who seeks to buy goods, the latter having the option of foregoing the purchase. *See, e.g., General Motors Acceptance Corp. v. Weinrich*, 218 *Mo.App.* 68, 262 *S.W.* 425, 428 (1924)("[A] purchaser is not like the needy borrower, a victim of a rapacious lender, since he can refrain from the purchase if he does not choose to pay the price asked by the seller.").

---

[9] The 16% civil usury interest ceiling, *N.J.S.A.* 31:1–1(a), has not been raised by Perez and is not at issue in this case.

On that basis, courts concluded that although money lenders were subject to the usury laws, those who made loans to sell their merchandise were not. James A. Ackerman, *Interest Rates and the Law: A History of Usury*, 27 *Ariz. St. L.J.* 61, 94 (1981).

The idea that the two types of loans were distinct was reflected in the judicial coining of the term "time price differential." James P. Nehf, *Effective Regulation of Rent–to–Own Contracts*, 52 *Ohio St. L.J.* 751, 785 n. 144. Courts used that term to refer to interest incurred in connection with the time sales of goods thus guaranteeing that such sales would escape the usury statutes that by their terms only governed "interest." *See* Eric A. Posner, *Contract Law in the Welfare State: A Defense of the Unconscionability Doctrine, Usury Laws, and Related Limitations on the Freedom to Contract*, 24 *J. Legal Stud.* 283, 303 (1995)("[C]ourts generally upheld retail installment contracts, on the ground that usury laws prohibit excessive interest on money loans, not on loans of goods."). Eventually the term "time price differential" made its way into the statutes.[10]

Legal scholars have challenged the economic basis for drawing a distinction between interest and a time price differential—concluding that the time price differential is nothing more than interest on a loan in the amount of the purchase price extended by a seller to a borrower. Steven W. Bender, *Rate Regulation at the Crossroads of Usury and Unconscionability: The Case for Regulating Abusive Commercial and Consumer Interest Rates Under the Unconscionability Standard*, 31 *Hous. L.Rev.* 721, 727 (1994)("[T]he 'time price' exemption ... employed the strained judicial fiction that merchants don't receive 'interest' when selling

---

[10] The term appeared in the precursor to RISA. *L.* 1948, *c.* 419. *N.J.S.A.* 17:16C–1($l$) defines "time price differential" as

the amount or amounts, however denominated or computed, in addition to the cash price or prices, to be paid by the retail buyer for the privilege of purchasing goods or services pursuant to a retail installment contract or a retail charge account. The term does not include the amount, if a separate charge is made therefore, for insurance and official fees.

their goods on time. Merchants charging more for goods paid over time than goods purchased for cash were thus freed from usury."); *see* 15 *Corbin on Contracts* § 87.4 (Bender ed.2003); National Consumer Law Center, *The Cost of Credit: Regulation and Legal Challenges* 50 (hereinafter *Cost of Credit* )(2d ed.2000); Ackerman, *supra,* 27 *Ariz. St. L.J.* at 88; *see also Hare v. General Contract Purchase Corp.,* 220 *Ark.* 601, 249 *S.W.*2d 973, 978 (1952)("Buying at a credit price, as distinguished from a cash price ... is being used as a cloak for usury in many cases by such words as 'time price differential,' or some other such language."). Commentators have also debunked the "compulsion" rationale, concluding that the need for the basic necessities of life is no less compelling than the need for money per se. *See Cost of Credit, supra,* at 50; Ackerman, *supra,* 27 *Ariz. St. L.J.* at 88.

However, the view that the time price doctrine insulated retail installment sales from usury continued to have currency in America through the mid-twentieth century. *See, e.g., Hogg, supra,* 66 *U.S.* at 118–19, 17 *L.Ed.* at 39–40; *Steffenauer v. Mytelka & Rose, Inc.,* 87 *N.J.Super.* 506, 511, 210 *A.*2d 88 (Ch.Div.1965)(citing New York, Pennsylvania, Delaware, District of Columbia, Connecticut, and Rhode Island cases subscribing to the time price doctrine). In fact, the charges associated with the credit sale of goods went generally unregulated up until the 1950s. At that point, in response to the drumbeat of scholarly criticism and consumer complaints, some states, including New Jersey, recognized that the credit sale of goods required regulation and began to adopt retail installment sales acts that set interest rate limits on credit sales transactions. *See* 15 *Corbin on Contracts* § 87.4 (Bender ed.2003); Ackerman, *supra,* 27 *Ariz. St. L.J.* at 94; Nehf, *supra,* 52 *Ohio St. L.J.* at 785 n. 144 (citing Jordan & Warren, *Disclosure of Finance Charges: A Rationale,* 64 *Mich. L.Rev.* 1285, 1295 (1966)). Through the incorporation of interest rate caps, those enactments effectively repudiated the historic treatment accorded the credit sale of goods and essentially replaced the usury laws that had been previously declared off-limits.

Like other state initiatives, New Jersey's RISA, which became law in 1960, was "part of a package of laws designed to protect consumers from overreaching by others, to protect consumers from overextending their own resources and also to promote the availability of financing to purchase various goods and services." *Girard Acceptance Corp. v. Wallace,* 76 *N.J.* 434, 439, 388 *A.2d* 582 (1978). Among other things, the statute prescribed the general form that retail installment contracts should take, *N.J.S.A.* 17:16C–21 to –25; required certain financial disclosures, *N.J.S.A.* 17:16C–27; detailed prohibited practices, *N.J.S.A.* 17:16C–35 to – 39; and imposed a 10% cap on the time price differential (interest) chargeable in connection with a sale, *L.* 1960, *c.* 40, § 41. Penalties for violation were also provided. *N.J.S.A* 17:16C–38.3.

## B.

At issue is whether Perez's transaction with Rent–A–Center constitutes a retail installment sales contract.[11] RISA defines a "retail installment contract" as follows:

"Retail installment contract" means any contract, other than a retail charge account or an instrument reflecting a sale pursuant thereto, entered into in this State between a retail seller and a retail buyer evidencing an agreement to pay the retail purchase price of goods or services, which are primarily for personal, family or household purposes, or any part thereof, in two or more installments over a period of time. This term includes a security agreement, chattel mortgage, conditional sales contract, or other similar instrument and any contract for the bailment or leasing of goods by which the bailee or lessee agrees to pay as compensation a sum substantially equivalent to or in excess of the value of the goods, and by which it is agreed that the bailee or lessee is bound to become, or has the option of becoming, the owner of such goods upon full compliance with the terms of such retail installment contract.

[*N.J.S.A.* 17:16C–1(b).]

The first sentence of the Act describes a covered sale. Briefly, the contract must be entered into between a retail seller and a retail buyer; it must evidence an agreement to pay the retail purchase price of goods in installments; and the goods must be for

---

[11] Most other states have enacted statutes dealing specifically with the rent-to-own industry. *Perez, supra,* 375 *N.J.Super.* at 88–91, 866 *A.2d* 1000.

personal, family, or household use. The second sentence of the Act is a catch-all by which the Legislature declared that instruments analogous but not identical to pure retail installment sales would also fall within the Act. By way of example, the Legislature named security agreements, chattel mortgages, and conditional sales. Also included was the category of "similar instruments," which was obviously intended to sweep in agreements that might not squarely fit into one of the previously described categories but which approximated them. Certain leases were included as well, presumably because the Legislature recognized that a transaction denominated as a lease could be, in substance, a retail installment sale. The question presented is whether Perez's rent-to-own contracts with Rent–A–Center are instruments covered by RISA.

It is uncontroverted that the leased goods at issue here are of the type described in RISA—for family, personal, or household use and that that provision of the Act requires no further explication by us. Neither are the definitions of "retail seller" and "retail buyer," standing alone, of special interest. RISA defines a "retail seller" as

> a person who sells or agrees to sell goods [12] or services under a retail installment contract or a retail charge account to a retail buyer, and shall include a motor vehicle installment seller.

[*N.J.S.A.* 17:16C–1(c).]

RISA defines a "retail buyer" as

> a person who buys or agrees to buy goods or services from a retail seller, not for the purpose of resale, pursuant to a retail installment contract or retail charge account.

[*N.J.S.A.* 17:16C–1(d).]

---

[12] RISA defines "goods" as

> all chattels personal which are primarily for personal, family or household purposes, including merchandise certificates and coupons to be exchanged for goods or services, having a cash price of $10,000.00 or less, but not including money or other choses in action. Goods shall not include chattels personal sold for commercial or business use.
> [*N.J.S.A.* 17:16C–1(a).]

As the Appellate Division acknowledged, those "definitions are circular because they refer back to the phrase 'retail installment contract,' which is a separately defined term under RISA." *Perez, supra,* 375 *N.J.Super.* at 80, 866 *A.*2d 1000. In other words, whether Rent–A–Center fits the definition of "retail seller" and Perez fits the definition of "retail buyer" depends on whether their transaction is consistent with RISA's description of a "retail installment contract." That issue of statutory interpretation is the nub of the case.

## C.

We turn again to the second sentence of *N.J.S.A.* 17:16C–1(b):

This term includes a security agreement, chattel mortgage, conditional sales contract, or other similar instrument and any contract for the bailment or leasing of goods by which the bailee or lessee agrees to pay as compensation a sum substantially equivalent to or in excess of the value of the goods, and by which it is agreed that the bailee or lessee is bound to become, or has the option of becoming, the owner of such goods upon full compliance with the terms of such retail installment contract.

[*N.J.S.A.* 17:16C–1(b).]

█ Rent–A–Center first argues, and the Appellate Division agreed, that the lease with Perez falls outside of RISA because it does not reflect "an absolute and unequivocal obligation on the part of Perez to purchase the items she leased." We disagree. There is nothing in RISA that mandates an "absolute and unequivocal obligation" to purchase. Indeed, the last clause of *N.J.S.A.* 17:16C–1(b) says just the opposite. It states that a RISA contract includes a lease, pursuant to which the bailee or lessee is "bound to become or has *the option of becoming,* the owner of such goods upon full compliance with the terms of such retail installment contract." *N.J.S.A.* 17:16C–1(b) (emphasis added). Obviously, if the lessee has the "option" to purchase goods, then, by definition, he or she has the "option" not to purchase them. Accordingly, reading the statute as a whole, it seems clear that the Legislature never intended an "absolute" or "unequivocal" obligation on the part of the customer to buy the goods.

██ Alternatively, Rent–A–Center contends that even if RISA does not require an absolute obligation to *purchase* the goods, it plainly requires an obligation by the lessee to pay "a sum equivalent to or in excess of the retail value of the goods." According to Rent–A–Center, that is a condition separate from the option to purchase, as evidenced by the Legislature's conjoining the phrases with the word "and." Because Rent–A–Center's leases do not obligate a lessee to pay a sum certain and the lessee is free to cancel at any time without having incurred debt, Rent–A–Center maintains that the transaction falls outside the plain language of RISA.

Perez counters that she agreed to pay "a sum substantially equivalent to or in excess of the value of the goods" in order to exercise the option to purchase, and that that broadly satisfies the statutory language. She further argues that the right to cancel is of no consequence.

██ Certainly, it would be fair to say that in this respect Perez's rent-to-own contracts are not a perfect fit with the words of the statute. Consequently, we are faced with the problem recognized by Chief Justice Weintraub in *New Capitol Bar & Grill Corp. v. Div. of Emp. Sec.*, 25 *N.J.* 155, 135 *A.2d* 465 (1957), when he said:

> It is frequently difficult for a draftsman of legislation to anticipate all situations and to measure his words against them. Hence cases inevitably arise in which a literal application of the language used would lead to results incompatible with the legislative design.
>
> [*Id.* at 160, 135 *A.2d* 465.]

Our obligation in such a circumstance is to interpret the statute reasonably to serve its apparent legislative purpose. In furtherance of that goal, we long ago established that

> in the quest for the intention, the letter gives way to the rationale of the expression. The words used may be expanded or limited according to the manifest reason and obvious purpose of the law. The spirit of the legislative direction prevails over the literal sense of the terms. The particular words are to be made responsive to the essential principle of the law. When the reason of the regulation is general, though the provision is special, it has a general acceptation. The language is not to be given a rigid interpretation when it is apparent that such

meaning was not intended. The rule of strict construction cannot be allowed to defeat the evident legislative design. The will of the lawgiver is to be found, not by a mechanical use of particular words and phrases, according to their actual denotation, but by the exercise of reason and judgment in assessing the expression as a composite whole. The indubitable reason of the legislative terms in the aggregate is not to be sacrificed to scholastic strictness of definition or concept. *Wright v. Vogt*, 7 *N.J.* 1 [80 *A.2d* 108] (1951). It is not the meaning of isolated words, but the internal sense of the law, the spirit of the correlated symbols of expression, that we seek in the exposition of a statute. The intention emerges from the principle and policy of the act rather than the literal sense of particular terms, standing alone. *Caputo v. Best Foods, Inc.*, 17 *N.J.* 259 [111 *A.2d* 261] (1955).

[*Alexander v. N.J. Power and Light Co.*, 21 *N.J.* 373, 378–79, 122 *A.2d* 339 (1956).]

■ In enacting RISA, the stated legislative purpose was protection of the public interest through the regulation of the charges associated with the time sale of goods. By including conditional sales, chattel mortgages, security interests, leases, and similar instruments within RISA's protective ambit, the Legislature signaled that it intended to sweep into the Act as many cognate agreements as possible, even those that did not strictly fall within a denominated category. That broad mandate, along with the well-established notion that remedial statutes like RISA should be liberally construed to achieve their salutary aims, *Barratt v. Cushman & Wakefield*, 144 *N.J.* 120, 127, 675 *A.2d* 1094 (1996), require questions regarding the applicability of the statute to be resolved in favor of consumers for whose protection RISA was enacted.

So instructed, we are satisfied that the language of RISA was intended to cover agreements like the ones between Rent–A–Center and Perez. Like most rent-to-own consumers, Perez entered into the transactions with Rent–A–Center in order to become the owner of the goods. She took possession of the goods pursuant to instruments that renewed automatically and that were reflected on Rent–A–Center's books, not as weekly leases, but as long term arrangements of 90 to 120 weeks, respectively. A portion of each of Perez's payments was assigned to defray the cost of the goods. The remainder of each payment was interest for the privilege of paying for the goods in installments. Perez

"agreed" that she would have to pay the value of the goods in order to own them. In fact, she would receive title upon the fulfillment of the lease provisions: payment of the value of the goods and exercise of the option by the proffer of the option price. Although Perez could choose not to complete the contract, the entire transaction was structured with ownership as its goal. Thus, on the continuum from pure lease to pure sale, we view Perez's arrangements with Rent–A–Center as closer to the latter than to the former.

Our conclusion is undergirded by the lease clause when read in the context of two of the denominated RISA categories: "conditional sales" and "similar instruments." A sale is conditional when possession of the goods is transferred to the buyer who will receive title at some future time upon payment of the full price or upon the happening of some other condition or contingency. If the contingency or condition is not satisfied, title will not pass.[13] That definition is fully descriptive of Perez's leases. Possession of the goods was transferred to her with title to pass upon the satisfaction of the lease terms and the payment of the option price. If she ceased paying, title would not pass. Indeed, Perez's leases are similar in form to transactions that have been judicially recognized as conditional sales. *Nat'l Cash Register Co. v. Daly,* 80 *N.J.L.* 39, 76 *A.* 325 (N.J.Sup.Ct.1910)(finding cash register contract giving lessee option to purchase for deposit amount at end of lease conditional sale); *Lauter Co. v. Isenreath,* 77 *N.J.L.* 323, 72 *A.* 56 (N.J.Sup.Ct.1909)(finding piano contract retaining title in lessor until all payments made and allowing repossession at any time upon any non-payment conditional sale); *Albert Lifson & Sons, Inc. v. Williams,* 10 *N.J. Misc.* 982, 984, 162 *A.* 129 (Ct. Equity 1931)(finding furniture lease agreement ending in repos-

---

[13] The term was so defined in the 1919 Conditional Sales Act. *See L.* 1919, *c.* 210. Part of that language was incorporated into the definition of "retail installment contract" under the 1948 Retail Installment Sales Act, *L.* 1948, *c.* 419, the precursor to RISA. *L.* 1960, *c.* 40. Neither Act defined "conditional sale."

session upon non-compliance and ownership upon compliance conditional sale); *see also In re Vandewater & Co.*, 219 *F.* 627 (D.N.J.1915)(finding contract giving lessee option to purchase property during or after installment period with deduction for lease payments conditional sale).

Although RISA does not define the term "conditional sale," when the Legislature utilizes words that have previously been the subject of judicial construction, it is deemed to have used those words in the sense that has been ascribed to them. *State v. Thomas,* 166 *N.J.* 560, 567–68, 767 *A.2d* 459 (2001); *Quaremba v. Allan,* 67 *N.J.* 1, 14, 334 *A.2d* 321 (1975)(noting that in interpreting statute, it is assumed Legislature is conversant with its own legislation and judicial construction placed thereon). Thus, we view Perez's leases as a form of conditional sale as that term is used in RISA.

At the very least, Perez's leases were instruments "similar" to conditional sales. *N.J.S.A.* 17:16C–1(b). Indeed, it seems to us that RISA's reference to "similar instruments" was intended to sweep in cleverly drafted agreements like the one before us so that "subtle distinctions" are not allowed to defeat the manifest purposes of the law. *Vandewater, supra,* 219 *F.* at 629.

We are simply not satisfied that the cancellation provision so altered the fundamental nature of the transaction that it insulated Perez's leases from the protections of RISA. That conclusion is bolstered by the fact that the majority of rent-to-own contracts are intended for and in fact result in ownership, not cancellation. To exclude the many purchasers from the protective sweep of RISA by providing a cancellation option that few would exercise would be an intolerably narrow interpretation of a statute limned for consumer protective purposes.[14] As the Minnesota Supreme Court observed of rent-to-own contracts like the one before us:

---

[14] Rent–A–Center's counter-intuitive characterization of the cancellation provision as an important element to consumers does not change our view. Although the convenience of cancellation may be a plus for the minority of rent-to-own

> [A]lthough these transactions purport to be short-term leases, they operate in substance much like ordinary installment sales. Consumers who purchase goods through rent-to-own agreements may not incur debt, but they still implicitly pay interest in return for the ability to pay for goods over time. Moreover, rent-to-own customers may not have an absolute obligation to repay a principal amount, but their situation is analogous to that of ordinary buyers on credit in that they must either forfeit possession of a good or continue paying for it.
>
> [*Miller v. Colortyme, Inc.*, 518 *N.W.*2d 544, 549 (Minn.1994).]

We agree, and hold that RISA applies to the rent-to-own contracts at issue here.

## V

■ We turn next to Perez's contention that the 30% interest rate cap in the criminal usury statute, *N.J.S.A.* 2C:21-19(a), applies to the time price differential in RISA.

## A.

■ Our point of departure is the language of the Act. The criminal usury statute prohibits the taking of "any money or other property as interest on the loan or on the forbearance of any money" in "excess of 30% per annum." *N.J.S.A.* 2C:21-19(a). As we have previously noted, the time price differential is interest. Indeed, the terms interest and time price differential are used interchangeably within RISA, *see, e.g., N.J.S.A.* 17:16C-41, and we have judicially declared them to mean the same thing. *See Singer Co. v. Gardner*, 65 *N.J.* 403, 409, 323 *A.*2d 457 (1974)("[t]he interest, and thus the time-price differential") (majority opinion); *id.* at 419 n. 1, 323 *A.*2d 457 ("[t]he effective interest or time price differential.") (Pashman, J., dissenting); *see also Stanton v.*

---

consumers who need short term rentals or want to try a product, it is unlikely that the vast majority of rent-to-own consumers consider the option of consequence. According to at least one commentator, most rent-to-own consumers view cancellation as antithetical to the ownership purpose of the transaction and counterproductive insofar as cancellation is costly and goods will have to be obtained elsewhere in any event. Ronald Paul Hill, *Stalking the Poverty Consumer: A Retrospective Examination of Modern Ethical Dilemmas*, 37 *J. Bus. Eth.* 209, 215 (2002).

*Mattson,* 175 *Neb.* 767, 123 *N.W.*2d 844, 847 (1963)(finding time price differential to be interest and usurious).

At the time of its enactment, RISA contained its own limitation on the time-price differential that could be charged in connection with a retail installment sales agreement. With the exception of motor vehicles, the cap was 10%. *L.* 1960, *c.* 40, § 41. In 1981, as a result of escalating market interest rates during the prior decade, Ackerman, *supra,* 27 *Ariz. St. L.J.* at 105–107, New Jersey, like many other jurisdictions, enacted an omnibus bill, Senate Bill No. 3005 ("*S.* 3005"), *L.* 1981, *c.* 103, to remove interest rate caps in a passel of different lending statutes.[15] Specifically, in connection with RISA, *S.* 3005 removed the 10% limitation on time price differentials and adopted the present statutory language:

> A retail seller and a motor vehicle installment seller, under the provisions of this act, shall have authority to charge, contract for, receive or collect a time price differential as defined in this act, on any retail installment contract evidencing the sale of goods or services *in an amount or amounts as agreed to by the retail seller* or motor vehicle installment seller *and the buyer* on motor vehicles and on all other goods or services.
>
> [*N.J.S.A.* 17:16C–41 (emphasis added).]

That language authorizes parties to agree to the amount of a time price differential. According to Rent–A–Center, the statute, as written, entitles it to charge what the proverbial traffic will bear. We disagree. That might be the answer had *S.* 3005 been enacted in a vacuum and had Senate Bill No. 3101 ("*S.* 3101"), *L.* 1981, *c.* 104, to which it was tethered, not specifically addressed the same subject.

---

[15] Among the acts addressed in *S.* 3005 were those regulating education loans, *N.J.S.A.* 17:9A–53.4; advance loans (overdraft accounts and credit cards), *N.J.S.A.* 17:9A–59.6; small business loans, *N.J.S.A.* 17:9A–59.27; loans of less than $5,000, *N.J.S.A.* 17:10–14, *repealed by L.* 1996, *c.* 157, § 5; second mortgages, *N.J.S.A.* 17:11A–44, *repealed by L.* 1987, *c.* 230, § 24; loans made by savings and loan associations, *N.J.S.A.* 17:12B–160; credit union loans, *N.J.S.A.* 17:13–27, *repealed by L.* 1984, *c.* 171, § 58; retail installment loans, *N.J.S.A.* 17:16C–41; retail charge accounts, *N.J.S.A.* 17:16C–44.1; home repair loans, *N.J.S.A.* 17:16C–69; and insurance premium financing, *N.J.S.A.* 17:16D–10.

Indeed, at the same time that *S.* 3005 replaced the specific interest rate ceilings in the lending statutes with an "agreed to" provision, the Legislature adopted *S.* 3101 and amended the criminal usury statute to lower the interest rate cap from 50% to 30%. *S.* 3101 was introduced by Senators Weiss, Merlino, and Parker, the sponsors of *S.* 3005, during the same time frame in which they were moving *S.* 3005 through the legislative process. Most importantly, *S.* 3101 addressed the "agreed to" language in *S.* 3005 and stated that its cap would trump that language:

> For the purposes of this section and *notwithstanding any law of this State which permits as a maximum interest rate a rate or rates agreed to by the parties of the transaction,* any loan or forbearance with an interest rate which exceeds 30% per annum shall not be a rate authorized or permitted by law. . . .
>
> [*N.J.S.A.* 2C:21–19 (emphasis added).]

Because RISA is, in substance, a "law of this state which permits as a maximum interest rate a rate or rates agreed to by the parties," it is subject to the 30% cap in *N.J.S.A.* 2C:21–19.

Apart from the very language of those acts, we think the circumstances surrounding their passage are powerful interpretative aids. Indeed, in *Fried v. Kervick,* 34 *N.J.* 68, 167 *A.*2d 380 (1961), we noted that statutes that are adopted on the same day should be read *in pari materia:*

> The statute being assailed . . . was adopted by the Legislature on the same day as the amendment to [the other statute]. The similarity of their subject matter, even though the latter is general in scope while the former is special, renders inescapable the conclusion that they are *in pari materia,* at least to the extent that both are reflective of the same type of legislative philosophy.

*Id.* at 70–71, 167 *A.*2d 380; *accord State v. Tillem,* 127 *N.J.Super.* 421, 427, 317 *A.*2d 738 (App.Div.1974) (observing the particular importance of considering together statutory provisions "passed at the same time to effectuate a given result or to overcome a certain evil"); Norman J. Singer, 2A *Sutherland Statutes and Statutory Construction* § 51:3 (6th ed. 2000) ("[T]he rule that statutes *in pari materia* should be construed together has the greatest probative force in the case of statutes relating to the same subject matter passed at the same session of the Legislature, especially if

they were passed or approved or to take effect on the same day.")
(citations omitted).

Applying those principles to *S.* 3005 and *S.* 3101, it seems clear
to us from the identity of language and sponsorship and the
lockstep enactment of those statutes that the Legislature intend-
ed, on the one hand, to free parties to retail installment sales
contracts to agree to interest rates reflective of market conditions
and, on the other, to protect consumers from overreaching mer-
chants by imposing an absolute cap of 30% within which the
parties to a RISA contract could negotiate.

If there was any doubt about that conclusion, Governor Byrne
laid it to rest in his statement upon signing the bills. He
recognized concerns over the elimination of interest rate ceilings
in *S.* 3005:

> Some believe that this bill will ruin many consumers. I disagree. I expect that
> our banks and other lenders will behave responsibly; competitive pressures should
> prevent lenders from setting artificially high interest rates. Similarly, I believe
> that most New Jersey consumers will avoid excessive indebtedness.
>
> [Statement of Governor Brendan Byrne in Signing *S.* 3005 and *S.* 3101 (March 31,
> 1981).]

Significantly, he also declared that those concerns by opponents of
*S.* 3005 were ameliorated by the lowering of the criminal usury
rate to 30%. *See id.*

 In that connection, it is well-established that "the gover-
nor's action in approving or vetoing a bill constitutes a part of the
legislative process, and the action of the governor upon a bill may
be considered in determining legislative intent." *Sutherland Stat-
utory Construction, supra,* § 48.05, *cited approvingly in State v.
Sutton,* 132 *N.J.* 471, 483, 625 *A.*2d 1132 (1993); *Fields v. Hoff-
man,* 105 *N.J.* 262, 270, 520 *A.*2d 751 (1987). We take from the
legislative history, including the governor's message, a legislative
intent to create a seamless scheme pursuant to which consumers
and sellers are accorded flexibility to negotiate interest rates to
reflect market conditions subject to the 30% safety cap.

## B.

Rent–A–Center's arguments that the criminal usury statute cannot have been intended to apply to RISA do not withstand scrutiny. First, there is nothing in the usury statute to suggest that its specific reference to the "agreed to" language was intended to exclude RISA. Second, as we have noted, and despite Rent–A–Center's contrary argument, the time price differential is, in fact, "interest," which is the operative term in the usury statute. Thus, there is nothing on the face of the statute that would be violated by its application here.

Rent–A–Center's contention that the time price differential is an historical exception to the usury statute, militating against reading it as subject to the usury cap, is equally unavailing. As we have observed, when, in the mid-twentieth century, states across the country began imposing interest rate caps on retail installment sales, that historical exception lost its currency. In fact, the RISA interest rates became a proxy for the usury laws. In other words, the idea that a loan made in connection with the time sale of goods should be unregulated fell out of favor long before this case, and provides no basis for us to decline application of the 30% cap to RISA. Moreover, even if the historical treatment of the time price differential still had currency in 1981 when *S.* 3101 and *S.* 3005 were enacted (which it did not), it goes without saying that the Legislature was free to abrogate that common-law notion if it chose to. We view the enactment of RISA in 1960 along with the amendments to RISA and the usury statute in 1981 as such an abrogation.

Rent–A–Center next argues that we should interpret some recent legislative initiatives as supporting its view. In particular, it references several unsuccessful legislative attempts, since 1990, to amend RISA to expressly limit the permissible time price differential to the 30% rate permitted under the criminal usury statute. *See, e.g., Assemb. B.* 195, 210th Leg. (N.J.2002); *Assemb. B.* 1699, 210th Leg. (N.J.2002); *Assemb. B.* 3399, 209th Leg. (N.J.2001); *S.B.* 1491, 208th Leg. (N.J.1998); *Assemb. B.*

294, 208th Leg. (N.J.1998); *Assemb. B.* 682, 207th Leg. (N.J.1996); *Assemb. B.* 4780, 204th Leg. (N.J.1990). Rent–A–Center contends that those initiatives show that the usury cap is not presently applicable to RISA. But unsuccessful attempts to amend a statute are of little use in determining the intent of the Legislature when enacting the original law. *Garden State Farms, Inc. v. Bay,* 77 *N.J.* 439, 453, 390 *A.*2d 1177 (1978) (quoting C. Sands, 2A *Sutherland Statutory Construction* § 48.18 (4th ed.1973)); *Fraser v. Robin Dee Day Camp,* 44 *N.J.* 480, 486, 210 *A.*2d 208 (1965).

Additionally, in two of the cited unsuccessful legislative attempts, the sponsor's statements regarding the failed bills specifically contradict Rent–A–Center's interpretation. They indicate that the intent of the proposed amendments was to "make[ ] explicit" what the sponsor already believed to be the case, i.e., that the time price differentials permitted under RISA were subject to the provisions of the criminal usury law. *Assemb. B.* 195, 210th Leg. (N.J.2002); *Assemb. B.* 3399, 209th Leg. (N.J.2001).

Finally, Rent–A–Center claims that our case law embraces its view that the usury cap cannot be imported into RISA. In support, it cites *Sliger v. R.H. Macy & Co., Inc.,* 59 *N.J.* 465, 468–69, 283 *A.*2d 904 (1971), *Saul v. Midlantic Nat'l Bank/South,* 240 *N.J.Super.* 62, 572 *A.*2d 650 (App.Div.1990), and *Steffenauer, supra,* 87 *N.J.Super.* 506, 210 *A.*2d 88. Again, we disagree. Those opinions are no impediment to our holding here. Neither *Sliger, Steffenauer,* nor *Saul* have any relevance to the issue before us. Rather, those cases analyzed installment sales relative to the civil usury statute, which contains language that is entirely distinct from *N.J.S.A.* 2C:21–19. Unlike the criminal usury statute that sweeps in all cases where rates are "agreed to," the civil usury statute specifically carves out from its coverage other statutes that establish a different interest rate.[16] Further, *Saul,* which was

---

[16] The civil usury statute provides:

*Except as herein and otherwise provided by law,* no person shall, upon contract, take, directly or indirectly for loan of any money, wares, merchan-

decided after *S.* 3101 and *S.* 3005 were enacted, actually holds that the criminal usury statute is applicable to retail installment sales. *Saul, supra,* 240 *N.J.Super.* at 66 n. 1, 572 *A.2d* 650.

We therefore reject Rent–A–Center's arguments to the contrary and hold that the language used and the circumstances surrounding the enactment of *S.* 3101 and *S.* 3005 clearly establish the relationship between the statutes. By their passage, the Legislature eliminated the specific 10% cap in RISA, which was far below market rates at the time, to allow the free play of supply and demand to inform negotiated rates. At the same time, it imposed an absolute ceiling of 30% on RISA that was sufficiently above the upper limits of the free market to allow flexibility and yet protect consumers from themselves and rapacious sellers. In sum, we interpret RISA as incorporating the 30% cap. It follows that Rent–A–Center's rent-to-own contracts, which are governed by RISA, are subject to the cap. Therefore, the counts of Perez's complaint that allege a violation of those statutes should be reinstated.

## VI

We turn finally to Perez's claim that the Appellate Division erred in failing to separately address her CFA counts.

## A.

The CFA was passed "to protect consumers 'by eliminating sharp practices and dealings in the marketing of merchandise and real estate.'" *Lemelledo v. Beneficial Mgmt. Corp. of Am.,* 150 *N.J.* 255, 263, 696 *A.2d* 546 (1997)(quoting *Channel Cos. v.*

---

dise, goods and chattels, above the value of $6.00 for the forbearance of $100.00 for a year, or when there is a written contract specifying a rate of interest, no person shall take above the value of $16.00 for the forbearance of $100.00 for a year.

[*N.J.S.A.* 31:1–1(a)(emphasis added).]

*Britton,* 167 *N.J.Super.* 417, 418, 400 *A.*2d 1221 (App.Div.1979)). It prohibits

[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby.....

[*N.J.S.A.* 56:8–2.]

"Merchandise" includes "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." *N.J.S.A.* 56:8–1(c). "Sale" is defined as "any sale, rental or distribution, offer for sale, rental or distribution or attempt directly or indirectly to sell, rent or distribute." *N.J.S.A.* 56:8–1(e).

■■■ Rent–A–Center concedes that the Act covers the rent-to-own transactions involved here. However, it argues, citing *Lemelledo, supra,* 150 *N.J.* 255, 696 *A.*2d 546, that if RISA applies, then the CFA cannot apply because the transaction was "subject to comprehensive regulation." Again, we disagree.

The CFA itself instructs that it should be applied in conjunction with other statutes or common law, *N.J.S.A.* 56:8–2.13 provides:

The rights, remedies and prohibitions accorded by the provisions of this act are hereby declared to be in addition to and cumulative of any other right, remedy or prohibition accorded by the common law or statutes of this State, and nothing contained herein shall be construed to deny, abrogate or impair any such common law or statutory right, remedy or prohibition.

*Lemelledo* addresses that point:

The language of the CFA evinces a clear legislative intent that its provisions be applied broadly in order to accomplish its remedial purpose, namely, to root out consumer fraud.

 . . . .

... We are loathe to undermine the CFA's enforcement structure, which specifically contemplates cumulative remedies and private attorneys general, by carving out exemptions for each allegedly fraudulent practice that may concomitantly be regulated by another source of law. The presumption that the CFA applies to covered practices, even in the face of other existing sources of regulation, preserves the Legislature's determination to effect a broad delegation of enforcement authority to combat consumer fraud.

In order to overcome the presumption that the CFA applies to a covered activity, a court must be satisfied ... that a direct and unavoidable conflict exists between

application of the CFA and application of the other regulatory scheme or schemes. It must be convinced that the other source or sources of regulation deal specifically, concretely, and pervasively with the particular activity, implying a legislative intent not to subject parties to multiple regulations that, as applied, will work at cross-purposes. We stress that the conflict must be patent and sharp, and must not simply constitute a mere possibility of incompatibility.

[*Lemelledo, supra,* 150 *N.J.* at 264, 270, 696 *A.*2d 546.]

Here, Rent–A–Center has not suggested, even obliquely, any conflict between the CFA and RISA, let alone one of a direct and unavoidable nature, nor do we perceive one. Accordingly, the acts must be construed in concert with each other and Rent–A–Center's contention that only one can be applicable at a time must be rejected.

### B.

The remaining question is whether the Appellate Division erred in omitting consideration of Perez's CFA count. Perez based her CFA claim on the notion that Rent–A–Center's interest charges were unconscionable and in violation of the CFA because they exceeded the 30% interest cap in RISA. Therefore, when the trial judge ruled against her on the applicability of RISA and the cap, he automatically dismissed the CFA claim as well. That Perez understood the intertwined nature of her claims is evidenced by the fact that she did *not* challenge the dismissal of her CFA claim on appeal. Accordingly, when the Appellate Division rejected her RISA and usury claims, there was no warrant for it to separately consider the CFA claim which was not before it and which had no independent factual or legal basis.

Because we have parted company from the Appellate Division on the fundamental issue of the applicability of RISA and the usury cap, to the extent that Perez's CFA claim is linked to them, it must be reinstated as well.

### VII

The judgment of the Appellate Division is reversed. The matter is remanded to the trial judge for reinstatement of Perez's complaint and for such further proceedings as are warranted.

Justice RIVERA–SOTO, concurring in part and dissenting in part.

To the extent the majority "hold[s] that [defendant] Rent–A–Center[, Inc.] is not collaterally estopped from defending against the [Retail Installment Sales Act ("RISA"), *N.J.S.A.* 17:16C–1 to – 61] claim [plaintiff Hilda] Perez has leveled against it[,]" *ante,* 186 *N.J.* at 201–02, 892 *A.*2d at 1263 (2006), I concur.

However, to the extent the majority concludes that "RISA applies to the rent-to-own contracts at issue here[,]" *ante,* 186 *N.J.* at 212, 892 *A.*2d at 1270 (2006); embraces plaintiff's contention that "the 30% interest rate cap in the criminal usury statute, *N.J.S.A.* 2C:21–19(a), applies to the time price differential in RISA[,]" *ante,* 186 *N.J.* at 212, 892 *A.*2d at 1270 (2006); and holds that plaintiff's individual and class claims under the Consumer Fraud Act, *N.J.S.A.* 56:8–1 to –135, must be reinstated, *ante,* 186 *N.J.* at 218–21, 892 *A.*2d at 1273–75 (2006), I respectfully dissent for substantially the reasons expressed in Judge Petrella's thoughtful and reasoned opinion below. *Perez v. Rent–A–Center, Inc.,* 375 *N.J.Super.* 63, 866 *A.*2d 1000 (App.Div.2005). I add only the following.

Many may consider the rent-to-own industry abhorrent. However, setting aside that particularly noxious version of *noblesse oblige,* the fact remains that merchants that offer goods on a rent-to-own basis nevertheless satisfy an important need. The Federal Trade Commission has acknowledged that

[r]ent-to-own transactions provide immediate access to household goods for a relatively low weekly or monthly payment, typically without any down payment or credit check. Consumers enter into a self-renewing weekly or monthly lease for the rented merchandise, and are under no obligation to continue payments beyond the current weekly or monthly period.... These terms are attractive to many consumers who cannot afford a cash purchase, may be unable to qualify for credit, and are unwilling or unable to wait until they can save for a purchase. Some consumers also may value the flexibility offered by the transaction, which allows return of the merchandise at any time without obligation for further payments or negative impact on the customer's credit rating. Other consumers may rent merchandise to fill a temporary need or to try a product before buying it. [Federal Trade Commission, *Bureau of Economics Staff Report: Survey of Rent-to-Own Customers* ES–3 (April 2000).]

Moreover, the New Jersey Legislature has similarly recognized the value and contributions of this industry in a most eloquent way: by simply leaving it alone. As the Appellate Division noted in its Appendix, "[v]irtually every other state in the nation, as well as the District of Columbia, has adopted a statute explicitly regulating rent-to-own contracts as a distinct transactional form. The *only* exceptions are *New Jersey,* North Carolina and Wisconsin." *Perez v. Rent–A–Center, Inc., supra,* 375 *N.J.Super.* at 89, 866 *A.*2d 1000 (emphasis supplied).

If there is a need to regulate the rent-to-own industry—a need certainly not demonstrated in this record—then the source of that regulation should be legislative or executive action, and not a cobbled-together judicial cure for a perceived but unsubstantiated ill. Because a rent-to-own contract is not a "retail installment contract" under RISA, the provisions of RISA simply are inapplicable by their own terms. Further, because the criminal usury statute is not intended to apply to a time-price differential, that is, the difference between the cash price of an item and the cost to purchase that same item on credit, it similarly does not apply to rent-to-own contracts. Finally, because plaintiff's individual and class Consumer Fraud Act claims are based on her RISA and criminal usury claims, those too should fail.

For the foregoing reasons, I respectfully dissent.

*For reversal and remandment*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN and WALLACE—6.

*For concurrence in part; dissent in part*—Justice RIVERA-SOTO—1.